

UNITED STATES DISTRICT COURT  04 JUL -2  AM 11: 49
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION   MIDDLE DIST       FLORIDA
ORLANDO, FLORIDA

GILBERT POLO, individually
and on behalf of all
others similarly situated,

        Plaintiff,               Case No.: 6:03-CV-134-ORL-28 JGG

v.

GOODING'S SUPERMARKETS,
INC., a Florida corporation, E*TRADE
BANK, a federal savings bank, E*TRADE
ACCESS, INC.,

        Defendants.

_____/

## PLAINTIFF'S MEMORANDUM IN SUPPORT
### OF
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

    Plaintiff, GILBERT POLO ("Polo"), by and through his undersigned counsel, has filed

Plaintiff's Motion for Summary Judgment, pursuant to Rule 56, Fed. R. Civ. P., asking this

Court for an order granting summary judgment in favor of Plaintiff on Plaintiff's one-count

Complaint filed in this action. Pursuant to Local Rules of the U.S. Dist. Ct. M.D. Fla. 3.01,

Plaintiff hereby files this Memorandum in Support of Plaintiff's Motion for Summary Judgment.

### I.    Statement of Undisputed Facts

    Polo incorporates herein the Statement of Undisputed Facts set forth in his Motion for

Summary Judgment.



## II.    Applicable Law – Motions for Summary Judgment

### A.    Procedural Authority

Rule 56(a), Fed. R. Civ. P., reads as follows:

> A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for summary judgment in the party's favor upon all or part thereof.

Rule 56(c), Fed. R. Civ. P., reads in relevant part as follows:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

Section 2.H. of the Case Management and Scheduling Order issued in this action provides that dispositive motions shall be filed by July 2, 2004.

### B.    Burdens and Standard of Review

The movant for summary judgment has the initial burden of demonstrating the nonexistence of any genuine issue of material fact.  Allen v. Tyson Foods, Inc., 121 F.3d 642 (11th Cir. 1997).  Once the movant satisfies his initial burden, the burden shifts to the nonmovant to "come forward with 'specific facts showing that there is a genuine issue for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.ED.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)).  "A mere 'scintilla of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury

2

could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990)

(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d

202 (1986).   All justifiable inferences are to be drawn in favor of the nonmoving party.

Anderson, 477 U.S. at 255, 106 S.Ct. at 2513.   "Where the record taken as a whole could not

lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."

Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356.

     The standard of review to be applied by an appellate court when reviewing a trial court's

order on a motion for summary judgment is *de novo*.   Allen, 121 F.3d at 646.

### III.   Applicable Law – Electronic Fund Transfers Act (Title 15 U.S.C. §§ 1693 *et seq*.) and Regulation E (12 CFR 205 *et seq*.)

     Plaintiff has alleged in his Complaint that Defendants violated Title 15 U.S.C. §

1693b(d)(3)(A) and Title 12 CFR § 205.16(c) because Defendants failed to disclose the

transaction fee charged to Polo on the screen of the ATM.  Title 15 U.S.C. §§ 1693 *et seq*. is

commonly known as the Electronic Funds Transfer Act (the "Act").  Title 12 CFR 205 *et seq*.,

commonly known as Regulation E, contains regulations promulgated by the Board of Governors

of the Federal Reserve System to implement the Act (the Act and Regulation E shall hereinafter

be collectively referred to as "EFTA").  EFTA provides for, among other things, the timing and

substance of specified disclosures to be given by operators of ATMs to users of ATMs.

     Specifically, Title 15 U.S.C. § 1693b(d)(3)(A) – (C) reads in relevant part as follows:

     (3) Fee disclosures at automated teller machines.

3

(A) In general. The regulations prescribed under paragraph (1)[1] shall require any automated teller machine operator who imposes a fee on any consumer for providing host transfer services to such consumer to provide notice in accordance with subparagraph (B) to the consumer (at the time the service is provided) of--

(i) the fact that a fee is imposed by such operator for providing the service; and

(ii) the amount of any such fee.

(B) Notice requirements.

(i) On the machine. . . .

(ii) On the screen. The notice required under clauses (i) and (ii) of subparagraph (A) with respect to any fee described in such subparagraph <u>shall appear on the screen of the automated teller machine</u>, or on a paper notice issued from such machine, <u>after the transaction is initiated and before the consumer is irrevocably committed to completing the transaction</u> . . . .[2]

(C) Prohibition on fees not properly disclosed and explicitly assumed by consumer. <u>No fee may be imposed by any automated teller machine operator</u> in connection with any electronic fund transfer initiated by a consumer for which a notice is required under subparagraph (A), unless--

(i) the consumer receives such notice in accordance with subparagraph (B); and

(ii) the consumer elects to continue in the manner necessary to effect the transaction after receiving such notice.

(Emphasis added.)

Specifically, Title 12 CFR § 205.16 reads in relevant part as follows:

---

[1] Title 15 U.S.C. § 1693b(d)(1) provides that "[i]f electronic fund transfer services are made available to consumers by a person other than a financial institution holding a consumer's account, the [Federal Reserve] Board shall by regulation assure that the disclosures, protections, responsibilities, and remedies created by this .title are made applicable to such persons and services."

[2] EFTA provides that through December 31, 2004, this clause shall not apply to any automated teller machine that lacks the technical capability to disclose the notice on the screen or to issue a paper notice after the transaction is initiated and before the consumer is irrevocably committed to completing the transaction. This exception is inapplicable in the present case. The ATM used by Polo on July 5, 2002, did not lack the technical capability to disclose the required notice on the screen or to or to issue a paper notice after the transaction was initiated and before Polo was is irrevocably committed to completing the transaction.

205.16  Disclosures at automated teller machines.

(a) Definition. Automated teller machine operator means any person that operates an automated teller machine at which a consumer initiates an electronic fund transfer or a balance inquiry and that does not hold the account to or from which the transfer is made, or about which an inquiry is made.

(b) General. An automated teller machine operator that imposes a fee on a consumer for initiating an electronic fund transfer or a balance inquiry shall:

(1) Provide notice that a fee will be imposed for providing electronic fund transfer services or a balance inquiry; and

(2) Disclose the amount of the fee.

(c) Notice requirement. An automated teller machine operator must comply with the following:

(1) On the machine. Post the notice required by paragraph (b)(l) of this section in a prominent and conspicuous location on or at the automated teller machine; and

(2) Screen or paper notice. Provide the notice required by paragraphs (b) (1) and (b) (2) of this section either by showing it on the screen of the automated teller machine or by providing it on paper, before the consumer is committed to paying a fee.

(d) Temporary exemption.  [Inapplicable to this action.]

(e) Imposition of fee. An automated teller machine operator may impose a fee on a consumer for initiating an electronic fund transfer or a balance inquiry only if

(1) The consumer is provided the notices required under paragraph (c) of this section, and

(2) The consumer elects to continue the transaction or inquiry after receiving such notices.

(Emphasis added.)

## IV.   Defendants Failed to Comply with EFTA Notice Requirements

Plaintiff has been unable to find any cases that have addressed the issues presented in this action.  However, the plain language of EFTA necessitates the conclusion that Defendants violated EFTA when they failed to provide the EFTA required notice to Plaintiff on the screen of the ATM.

Under EFTA, Defendants are ATM operators who imposed a fee for providing host transfer services to Polo on July 5, 2002.  As such, EFTA required Defendants to provide notice of the fee to be charged to Polo for the Transaction on the screen of the ATM.  Defendants clearly failed to comply with this EFTA notice requirement and therefore, were prohibited from charging a fee for Polo's use of the ATM.  Polo has suffered damages as a result of Defendants' violation of EFTA in that he was charged a fee that was not properly disclosed in compliance with EFTA.  Title 12 U.S.C. § 1693m provides that Defendants shall be liable to Polo for violations of Title 15 U.S.C. §§ 1693 *et seq.* in the amount of actual damages incurred, statutory damages of between $100 and $1,000, the costs of bringing an action and reasonable attorneys' fees as determined by the court.

### A.   Defendants Were Automated Teller Machine Operators

Title 15 U.S.C. § 1693b (d) (3) (D) (i) defines an "automated teller machine operator" as "any person who (i) operates an automated teller machine at which consumers initiate electronic fund transfers; and (ii) is not the financial institution that holds the account of such consumer from which the transfer is made."  Goodings admits it was an operator of the ATM used by Polo on July 5, 2002.  While E*Trade contests the fact that it was an operator of the ATM at the time

Polo used the ATM, the evidence to the contrary dictates a different conclusion.

It is undisputed that on July 5, 2002, the date Polo used the ATM, the ATM contained a notice that read in relevant part: "The operator of this ATM, E*Trade Access, Inc. . . ." (Emphasis added.) There is no evidence put forth by E*Trade that such notice was put on the ATM without its permission or authority, or that E*Trade was not aware of the foregoing notice on the ATM.

In addition, E*Trade itself referred to itself as the operator of a nationwide network of ATMs in the Form 10-Ks it filed with the United States Securities and Exchange Commission for the fiscal years ending December 31, 2001 and 2002. E*Trade also apparently accepted the responsibility to ensure that the screen notice on the ATM complied with EFTA.[3]

Finally, E*Trade and Goodings entered into an "E*TRADE ATM SITE LOCATION AGREEMENT" dated March 21, 2001,[4] pursuant to which E*Trade derived a financial benefit from the operation of the ATM and to which E*Trade dictates and/or controls the following aspects of the operation of the ATM:

(1)     The location of the ATM in the Goodings store (paragraph 1);

(2)     The right to schedule downtime to accomplish necessary maintenance or system improvements (paragraph 2);

(3)     The collection of all transaction revenue from the ATM, the payment to Goodings of a transaction fee for each transaction and the right to increase or decrease the amount of the payments to Goodings (paragraph 3);

_____

[3] See the ACS Surcharge Profile attached to Plaintiff's Motion for Summary Judgment as Exhibit "4".

[4] A copy of the E*TRADE ATM SITE LOCATION AGREEMENT is attached to the Declaration of Anthony Marcus, which is attached as Exhibit "2" to the Memorandum of Defendant, Gooding's Supermarkets, Inc. in Opposition to Plaintiff's Motion for Class Certification.

(4)     The ability of Goodings to impose a transaction fee based on E*Trade's processor/network rules, having the right to increase or decrease the portion of the transaction fee surcharge payable to Goodings and requiring Goodings to comply with all posting, consumer notification and other requirements <u>imposed by network rules</u> (paragraph 4);

(5)     E*Trade provides parts, maintenance and repair services for the ATM, the right to withhold transaction fees if E*Trade provided services aren't timely paid for, prohibiting Goodings from using another company to perform any service or repair work on the ATM without E*Trade's prior written approval, required notification by Goodings to E*Trade within 24 hours of any ATM failure, damage or other problem and E*Trade's right to enter upon the Goodings premises to inspect, repair, maintain or upgrade the ATM and to observe its use (paragraph 5);

(6)     Requiring Goodings to use the company of E*Trade's choice for data processing services (paragraph 6);

(7)     Prohibiting Goodings from placing any other brand name on the ATM without E*Trade's prior written consent, providing E*Trade with the exclusive right to advertise on the on the front, back, top and side panels on the ATM, the ATM receipt paper, all video monitors and audio devices on the ATM, and all other ATM surfaces, requiring Goodings to permit E*Trade advertising campaigns on the ATM (paragraph 7); and

(8)     Prohibiting Goodings from removing the ATM, placing any other automated teller machine on the Goodings premises, or subscribing to any other service for processing ATM transactions (paragraph 10).

The facts set forth above necessitate a finding by this Court that E*Trade was an operator of the ATM on the date Plaintiff used the ATM, July 5, 2002. Considering the notice on the ATM itself that reads that E*Trade was the operator of the ATM, disclosures by E*Trade's parent company in its Form 10-Ks filed with the SEC, its apparent acknowledgment of the responsibility to ensure that the ATM screen properly disclosed the Transaction fee, and its direction and/or control of virtually every aspect of the operation of the ATM, there is no genuine issue of fact on this point. On this issue, the evidence is so one sided that Plaintiff must

prevail as a matter of law. <u>Anderson</u>, 477 U.S. at 251, 252, 106 S.Ct. 2505. A rational trier of fact could not find that E*Trade was not the operator of the ATM.

**B.    Defendants Imposed a Fee for Plaintiff's Use of the ATM**

Title 15 U.S.C. § 1693b(d)(3)(A) requires an automated teller machine operator <u>who imposes a fee</u> on any consumer for providing host transfer services to provide certain specified notices. Defendants imposed upon Plaintiff and Plaintiff in fact paid a transaction fee for his use of the ATM. As paragraphs three and four of the E*TRADE ATM SITE LOCATION AGREEMENT provide (See preceding section of this Memorandum), Defendants split the transaction fee according to the terms of the E*TRADE ATM SITE LOCATION AGREEMENT. In addition, while some automated teller machine cardholders' financial institutions may reimburse users for ATM transaction fees, this was not the case with Plaintiff's use of the ATM that serves as the basis for this action. See paragraph 11 of the Affidavit of Polo attached to Plaintiff's Motion for Summary Judgment as Exhibit "1."

**C.    Defendants Provided "Host Transfer Services" to Plaintiff**

Title 15 U.S.C. § 1693b(d)(3)(D)(iii) defines "host transfer services" as "any electronic fund transfer made by an automated teller machine operator in connection with a transaction initiated by a consumer at an automated teller machine operated by such operator." Title 15 U.S.C. § 1693a(6) defines "electronic fund transfer" as " any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an . . . automated teller machine transaction . . . ." In addition, it is undisputed that Plaintiff initiated the electronic fund transfer when he used the ATM to obtain money on July 5, 2002. Defendants provided host transfer services to Plaintiff on July 5, 2002, when Plaintiff withdrew money from

the ATM.

### D.      Defendants Failed to Provide the Notice Required by EFTA

Title 15 U.S.C. § 1693b(d)(3)(B) and 12 CFR 205.16 require any automated teller machine operator who imposes a fee on any consumer for providing host transfer services to such consumer to provide notice of (i) the fact that a fee will be imposed for providing the service; and (ii) the amount of any such fee.  In addition to other notice requirements, the foregoing notice <u>shall appear on the screen of the automated teller machine</u>, or on a paper notice issued from such machine, <u>after the transaction is initiated and before the consumer is irrevocably committed to completing the transaction</u>.  It is undisputed that the foregoing notice required by EFTA was not provided to Plaintiff on the screen of the ATM when Plaintiff used the ATM on July 5, 2002.

### V.      The Affirmative Defenses Raised by Defendants are Not Supported by the Evidence and/or are Inapplicable

Affirmative defenses are in the nature of a confession and avoidance.  <u>Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Benton</u>, 467 So.2d 311 (Fla. 5th DCA 1985).

Affirmative defenses raise some new matter, which, if proven, legally defeats an otherwise apparently valid claim.  <u>Wiggins v. Portmay Corp.</u>, 430 So.2d 541 (Fla 1st DCA 1983); <u>Tropical Exterminator, Inc. v. Murray</u>, 171 So.2d 432 (Fla. 2nd DCA 1965).

### A.      Unintentional Violation and Bona Fide Error (Gooding's First and E*Trade's Third Affirmative Defense)

Title 15 U.S.C. § 1693m(c) reads as follows:

      Unintentional violations; bona fide error.  Except as provided in section

910 [Title 15 U.S.C. § 1693h; inapplicable in this case], a person may not be held liable in any action brought under this section for a violation of this title if the person <u>shows by a preponderance of evidence</u> that the violation was not intentional <u>and</u> resulted from a bona fide error <u>notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.</u>

Section 1693m(c) places the burden on Defendants to show by a preponderance of the evidence that their failure to comply with the notice provisions of EFTA was both unintentional <u>and that it resulted from a bona fide error notwithstanding procedures reasonably adapted to avoid any such error.</u>  It is not enough for Defendants to show only that the EFTA violation was unintentional.  Goodings has alleged no specific facts detailing how its disclosure violation was a bona fide error.

While there are no reported decisions interpreting Section 1693m(c), there are several decisions interpreting virtually identical provisions of other consumer protection statutes.  In <u>Gallegos v. Stokes</u>, 593 F.2d 372 (10th Cir. 1979), after finding that the defendant creditor violated the Truth-in-Lending Act for failing to comply with disclosure requirements of that Act, the court considered whether the creditor proved "by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." <u>Id</u>. at 376.  The <u>Gallegos</u> court stated that the defense "requires procedures designed to avoid and prevent errors which might slip through procedures aimed at good faith compliance, 'a safety catch or a rechecking mechanism." Id. at 376, *quoting* <u>Mirabal v. GMAC</u>, 537 F.2d 871, 878 (7th Cir. 1976), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 699 (1978).

Noting that the creditor calculated the amount to be disclosed "only once, and did not

recomputed or review his figures; that he had no preventive mechanism for catching errors", the court held that the creditor did not satisfy the requirements of the bona fide error defense. Gallegos at 376. See also, Webster v. Centex Home Equity Corp., 300 B.R. 787 (W.D. Ok. 2003) (errors not bona fide when there was no "extra preventative step ... safety catch or rechecking mechanism" to detect any errors. Webster at 799); Thomka v. A.Z. Chevrolet, Inc., 619 F.2d 246 (3rd Cir. 1980) (The requirement for maintaining reasonable procedures adapted to avoid any error "has been strictly construed by the courts to require that a special system be established to assure that no initial errors occur, and that a checking mechanism be maintained to catch any errors that slip through the system.", Thomka at 251); and Hutchings v. Beneficial Finance Co. of Oregon, 646 F.2d 389 (9th Cir. 1981).

In interpreting the identical bona fide defense language under TILA, the court in Mirabal wrote:

> This means that the procedures which Congress had in mind were to contain an extra preventative step, a safety catch or a rechecking mechanism. Congress left the exact nature of the preventative mechanism undefined. It is clear, however, that Congress required more than just a showing that a well-trained and careful clerk made a mistake. On the other hand, a showing that the first well-trained clerks figuring was checked by a second well-trained clerk or that one clerk made the calculations on an adding machine and then checked this by looking up the figures on a table would satisfy Congress' requirements.

Mirabal at 878-879.

Courts have granted summary judgment for plaintiff consumers when defendants have raised the bona fide error defense but could not meet the standard required by Congress. Smith v. Chapman, 436 F.Supp. 58 (W.D.Tx. 1977), *judgment aff'd*, Smith v. Chapman, 614 F.2d 968

(5th Cir. 1980) (Bona fide error defense rejected and summary judgment granted when TILA violations appeared on 374 consumer credit contracts in one year); <u>Abel v. Knickerbocker Realty Co.</u>, 846 F.Supp. 445 (D. Md. 1994); <u>Aldrich v. Upstate Auto Wholesale of Ithaca, Inc.</u>, 564 F.Supp. 390 (N.D. NY 1982); and <u>Sambolin v. Klein Sales Co.</u>, 422 F.Supp. 625 (S.D. NY 1976).

Goodings has admitted that from the moment the ATM went "on-line" on April 3, 2001 until August 5, 2002, that the ATM disclosed a transaction fee on its screen of $1.50, yet Defendants charged every consumer who used the ATM during that time period a transaction fee of $2.00. The mere fact that the ATM disclosure violated EFTA for over 16 months and for over 7,127[5] transactions strongly compels, if not requires, this Court to come to only one conclusion regarding whether Goodings (and E*Trade) implemented procedures reasonably adapted to avoid the EFTA violation that is the basis for this action. By definition, under these facts, the procedure adapted by Goodings and E*Trade to avoid the EFTA violation cannot be concluded to be "reasonable" and should not be considered so by this Court.

The Declaration of Ray Vann, a manager of Goodings who negotiated the E*Trade Site ATM Location Agreement and who became the Store Director at the Goodings Store on September 3, 2001, stated that the ATM was one of the first ATM machines that Goodings operated.[6] As such, it would have been reasonable to have charged one or more employees with

---

[5] E*Trade admits that between February 3, 2002 and August 5, 2002, the EFTA notice violation that is the basis for this action occurred with 7,127 consumers who used the ATM. Exrapolating the average number of users per day during this time period to the entire time period for which the disclosure failed to comply with EFTA results in 11,852 additional violations for a total of an estimated 18,979 consumer transactions for which Defendants violated the very same EFTA disclosure requirement that is the basis for Plaintiff's claim.

[6] See Declaration of Ray Vann attached as Exhibit "1" to the Memorandum of Defendant, Gooding's Supermarkets,

the responsibility to actually use the ATM to determine if it was working properly and in compliance with all laws governing the operation of the ATM. Apparently this never happened. If even one Goodings or E*Trade employee used the ATM soon after it went "on-line" to confirm that this new ATM was working properly and in compliance with all laws, or had done so on a weekly, monthly, or even yearly basis, the EFTA violations committed by Goodings and E*Trade would not have continued for over 16 months.

It should be noted that the way in which Goodings and E*Trade ultimately learned of the fact that the ATM they were operating was in violation of EFTA was not through their own due diligence or the procedures they claim to have adapted to avoid the EFTA violation. On this point Goodings has stated that it learned of the violations in two ways; first, through its receipt and attempted implementation of "Surcharge Reprogramming Instructions"[7] and second, through a complaint from a consumer who used the ATM and who requested a refund.[8] Query how long Goodings and E*Trade would have continued to violate EFTA if not for one of these two events that brought the violations to their attention.

This Court must conclude that due to the length of time and number of transactions in which Defendants violated EFTA, over a 16 month period and with regard to an estimated 27,000 transactions, that regardless of the procedures Defendants allege were in place by affidavit in response to this Motion, that such procedures were not "reasonably adapted to avoid" the Defendants' violation of EFTA. In light of these undisputed facts, this Court must conclude

---

Inc. in Opposition to Plaintiff's Motion for Class Certification.

[7] See page 6 of the Goodings Answer.

[8] See the carryover paragraph at the top of page 8 of the Goodings Answer.

as a matter of law that Defendants could not meet their burden of showing <u>by a preponderance of</u> <u>the evidence</u> that the EFTA violation was both unintentional and a bona fide error <u>notwithstanding the maintenance of reasonable procedures</u> to avoid the violations.

Defendant Goodings devotes over four pages of its Answer to this affirmative defense. A good portion of Goodings' discussion argues that because Goodings made a "half-hearted" gesture to deliver Plaintiff all of the money Goodings and E*Trade took from the 7,127 consumers over a six month period, that this is some how supports its bona fide error defense. Goodings argument on this point is simply not supported by the law and is disingenuous.

First, Goodings, by its own admission, learned of the EFTA violations on August 5, 2002. This action was filed almost six months later on February 3, 2003. It was only after the filing of this action that Goodings made its alleged "good faith" efforts to address its indiscretions. Further, two months after filing this action, and eight months after Goodings learned of the violations, Gooding sent to counsel for Plaintiff a check in an amount (i) that was based on the wrong number of consumer users, (ii) that didn't include the full amount of actual damages suffered by the consumers, (iii) that contained no statutory damages to which the consumers are entitled, (iv) that contained no amount for the costs and attorneys fees incurred by Plaintiff, (v) that provided no information pursuant to which Plaintiff would be able to locate the consumers in order to return their money, and (vi) that provided no amount for the costs that would be incurred in doing so.

Second, the basis for this affirmative defense as pled is that an ATM operator committed an unintentional and bona fide error notwithstanding reasonable procedures adapted to avoiding

15

such error.  In its four pages devoted to this affirmative defense, Goodings simply fails to address the legal basis for the affirmative defense, and presents argument that is simply irrelevant to the legal basis for the defense.

Third, the fact that Goodings made a feeble attempt to return improperly assessed ATM transaction fees eight months after it learned of its improper collection of those fees, and 2-3 months after it was sued for doing so, is irrelevant to the issue of whether Goodings and E*Trade adapted reasonable procedures to prevent the improper collection of those fees in the first place. EFTA requires an ATM operator to implement reasonable procedures to ensure that violations do not occur "before" they occur, not self-serving disingenuous actions after it is sued for those EFTA violations.

Fourth, Goodings states that an objective in making the offer to pay Plaintiff the amount of improperly collected transaction fees for over 7,000 consumer users is to avoid the need to litigate over the actual damage amount in the event Plaintiff succeeds in his Motion for Class Certification.  Plaintiff brought this action on behalf of all consumers who used the ATM when the disclosures required to be provided by Defendants were not given in accordance with EFTA. Without providing Plaintiff with the names and addresses of those consumers, and the costs of delivering the transaction fees due those consumers to Plaintiff, the offer is simply not credible. If Goodings did not have the names and addresses of those consumers,[9] and did not want to spend the time and money to obtain that information, then how did it realistically expect Plaintiff

---

9 Page 20 of Memorandum of Defendant, Gooding's Supermarkets, Inc. in Opposition to Plaintiff's Motion for Class Certification.

to do that which Goodings was unable or unwilling to do because of the time and money involved.

Further, in light of Gooding's claim that it doesn't have the names and addresses of the consumer users of the ATM, and doesn't want to expend the time and money to locate them, it appears as though in addition to the 7,127 consumers who used the ATM from February 3, 2002 through August 5, 2002, the estimated additional 20,000 consumers who used the ATM from the time it went "on-line" on April 3, 2001 to February 3, 2002, have not received a refund of any improperly collected fees as well.  For Goodings to take the position that its tender to Plaintiff somehow supports is bona fide error defense when Goodings itself is unable or unwilling to spend the time and/or money necessary to correct its own approximately 27,000 EFTA violations, is simply incredible.

**B.    Plaintiff's Failure to Follow Statutory Error Resolution Procedures (Gooding's and E\*Trade's fifth Affirmative Defense)**

E\*Trade argued in its Motion to Dismiss and Brief in Support of its Motion to Dismiss dated and served April 9, 2003 ("Defendants' Brief in Support of Motion to Dismiss"), that this Court should dismiss this action on the grounds that Plaintiff failed to exhaust the statutory error resolution procedure in 15 U.S.C. § 1693f.10 This Court denied E\*Trade's Motion to Dismiss pursuant to its Order dated July 8, 2003.  Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss contains Plaintiff's complete argument as to why this affirmative defense is either inapplicable or legally insufficient.  For purposes of brevity, Plaintiff will only provide an outline of those arguments herein.

---

[10] Goodings joined in E\*Trade's Motion to Dismiss pursuant the Joinder of Defendant, Gooding's dated April

1.   **The Error Resolution Process Is Inapplicable To Disclosure Violations**

     a.   **A Disclosure Violation is Not an Error**

Title 15 U.S.C. §1693f contains a list of the violations of EFTA that constitute errors subject to the error resolution process of that section: Disclosure violations are not considered errors subject to the resolution process.

Defendants have liability for their failure to comply with the very explicit disclosure requirements of EFTA. Courts have routinely found liability solely based on a party's failure to meet its disclosure obligations to consumers under various federal laws. Applebaum v. NMAC, 226 F.3d 214 (3d Cir 2000); Highsmith v. Chrysler Credit Corp., 18 F.3d 434 (7th Cir. 1994); Jordan v. Schaumberg Toyota, 1999 WL 116224 (N.D. Ill. 1999).

In addition, it is clear that a violation of the EFT fee disclosure requirements as they apply to a balance inquiry is not an error subject to the error resolution process. 12 CFR § 205.11(a) (2) (i). Consequently, even if the consumer wanted to go through the error resolution process, he would not be able to do so. *Id.* Congress could not have intended that a consumer making a balance inquiry have different remedies from a consumer making a funds withdrawal when the precise EFTA notice provision violated is the same.

     b.   **EFTA's Remedial Provisions Distinguish Between Violations by Financial Institutions and Violations by All Others**

Title 15 U.S.C. § 1693h, entitled "Liability of Financial Institutions," provides consumers with remedies for the violations specified therein by financial institutions. Title 15 U.S.C. § 1693m is a broader provision that provides consumers with remedies against "any person" who

------------------------------

17, 2003.

fails to comply with "any provision" of EFTA.   Requiring consumers and their financial institutions to attempt to resolve a violation of EFTA by a non-financial institution is contrary to the remedial rights granted to consumers for violations of EFTA by non-financial institutions.

**2.     The Error Resolution Process would be Futile**

**a.     A Disclosure Violation can't be "Resolved"**

A disclosure violation, by its very nature, cannot be "resolved." Once a party who has an obligation to disclose information to consumers prior to entering into a transaction with consumers fails to comply with the obligation, the obligation cannot be fulfilled at a later date. ". . . [T]he consumer suffers the harm of a disclosure violation when she relies on the improper disclosure and enters the lease. . . ." Jordan at 4.

**b.     The Error Resolution Procedures Do Not Require a Financial Institution to Investigate Beyond a Review of its Own Records**

Polo's financial institution has no obligation under EFTA to investigate Polo's complaint beyond a review of its own internal records.  12 CFR §205.11(c) (4).  Such a limited review could not determine the nature or extent of any alleged "error" that occurred in this case.

**c.     The Error Resolution Process Doesn't Provide the Remedies Authorized by Congress for Disclosure Violations**

Even assuming the error resolution process applied, financial institutions are not required to provide the relief to which Polo is entitled under §1693m.

**3.     The Exhaustion Doctrine Is Inapplicable**

**a.     The Error Resolution Process is not Mandatory**

There is no provision of EFTA that requires Polo to pursue the error resolution process.

**b.**     **Policies Underlying the Exhaustion Doctrine**

Polo's rights can not be vindicated through the error resolution process because his financial institution is not required to provide the EFTA remedies based on a violation of a third party ATM operator.

The remaining policies frequently cited by the courts as underlying the exhaustion doctrine are cited in cases involving proceedings before federal administrative agencies, where specific public policies can be fulfilled.

Even assuming the exhaustion doctrine is applicable, courts will not require exhaustion when the administrative remedy is inadequate.   The remedies available from financial institutions pursuant to the error resolution process are inadequate.

WHEREFORE, Plaintiff requests that this Court hold that there is no genuine issue as to any material fact as to any of the affirmative defenses raised by Defendants and that Plaintiff is entitled to judgment thereon in its favor against Defendants as a matter of law.

AND, WHEREFORE, Plaintiff requests that this Court hold that there is no genuine issue as to any material fact as the one Count Complaint filed by Plaintiff in this action, and/or in the alternative, for partial summary judgment on some or all of the elements of each Count, and that Plaintiff is entitled to judgment as a matter of law in its favor against Defendant for damages, pre-judgment and post-judgment, interest, costs and reasonable attorneys' fees and for such other relief allowed by law and deemed just and proper by this Court.

Respectfully submitted,

Brian G. Pincket , Esq.                              Lance A. Raphael, Esq.
Florida Bar No.: 501425                           Stacy Bardo, Esq.

20

MILAM & HOWARD NICANDRI                    The Consumer Advocacy Center
   DEES & GILLAM, P.A.                     180 West Washington, Suite 700
50 N. Laura Street, Suite 2900             Chicago, IL 60602
Jacksonville, Florida 32202                Telephone: (312) 782-5808
Telephone: (904) 357-3660                  Facsimile: (312) 377-9930
Facsimile: (904) 357-3661
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been furnished by facsimile and U.S. Mail this _____/_____ day of ᴶᵁᴸᵞ_____, 2004 to:

Todd Pittenger, Esq.
Lowndes, Drosdick, Doster, Kantor & Reed
215 North Eola Drive
Orlando, FL 32801

Attorney for Defendant
Gooding's Supermarkets, Inc.

and

John F. Henault, Jr., Esq.
Douglas P. Lobel, Esq.
David A. Vogel, Esq.
Arnold & Porter
1600 Tysons Blvd., Suite 900
McLean, VA 22102

Robert Brochin , Esq.
Morgan Lewis & Bockius LLP
5300 Wachovia Financial Center
200 South Biscayne Boulevard
Miami FL 33131-2339


Attorney for Defendant
E*Trade Access, Inc.

ATTORNEY