FILED

**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**GILBERT POLO,**                                    **NO: 6:03-CV-134-ORL-28 JGG**

        **Plaintiff,**

**v.**

**GOODING'S SUPERMARKETS, INC.** *et al.,*

        **Defendants.**
_____/

## MEMORANDUM IN SUPPORT OF E*TRADE ACCESS, INC.'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(c), Defendant E*TRADE Access,

Inc. hereby moves for summary judgment.  Plaintiff Gilbert Polo's claims against Access fail as

a matter of law.  First, Access did not commit any "error" under the Electronic Funds Transfer

Act ("EFTA").  Rather, the "error" in this case – if any – was solely the result of Gooding's

Supermarkets, Inc.  Second, to the extent any error did occur and Access can somehow be found

to have been responsible for the error, Plaintiff is precluded from recovery as a matter of law

under the EFTA's "bona fide error" exclusion from liability.

## INTRODUCTION

Plaintiff alleges he was overcharged by 50 cents at an ATM owned and operated

by Defendant Gooding's Supermarkets, and for which Access provides electronic data

processing services.  In its answer, Gooding's admits the amount of the transaction fee was 50

cents more than the amount disclosed on the ATM's screen.  According to Gooding's, this

discrepancy resulted from the inadvertent failure of a Gooding's employee to reprogram the

ATM at issue.  However, as Gooding's Answer explains, the amount of the fee actually charged,

728941



$2.00, *was* disclosed on *two* stickers posted on the ATM, which Plaintiff saw before proceeding with is transaction.

To recover for the alleged 50 cent overcharge, Plaintiff filed a class action seeking to certify a nationwide class of persons overcharged at any ATM for which Access provides electronic data processing services.  This Court denied fully Plaintiff's motion for class certification on March 16, 2003.  In this individual action, Plaintiff seeks actual and statutory damages, which in this case range between a minimum of $100.50 and a maximum of $1002.00. Plaintiff also seeks to recover his attorney's fees, which he claimed were $140,000 as of April 2, 2004.

Although Gooding's admits that the difference between the electronic fee-notice and the amount actually charged resulted from its employee's inadvertent programming error, Access denies any liability for the programming error.  Access's only connection to the electronic fee-notification at issue was to send Gooding's explicit instructions on programming the fee-notice into its ATM.  Furthermore, to the extent that Access was responsible in any way for the fee-notice discrepancy, recovery is completely barred by the EFTA's "bona fide error" defense.

## STATEMENT OF UNDISPUTED FACTS

Access, through third party vendors, provides electronic data processing services for merchant-owned ATMs, such as the Gooding's ATM at issue in this matter.  Declaration of Dale Dentlinger at ¶ 8 (filed on August 11, 2003 in support of Access's Opposition to Class Certification and attached hereto as Exhibit 1) ("Dentlinger Decl.").  Under the contract between Access and the merchants, the merchants decide whether a surcharge fee will be charged at its

ATM **and** the amount of that surcharge fee. *Id.* ¶ 10.  For example, the contract between Access

and Gooding's provides:

> Transaction Surcharges.   Location [Gooding's] may impose a
> transaction surcharge fee upon ATM transactions . . . .  Location
> may establish the initial surcharge amount . . . and may increase or
> decrease the surcharge fee in its sole discretion.[1]

Moreover, it is the merchants' obligation to ensure that their ATMs comply with all posting and

electronic notice requirements of the EFTA. *Id.* ¶ 11.  On this issue, the contract between

Gooding's and Access states:

> Transaction Surcharges. . . .   Location [Goodings] shall comply
> with all posting, consumer notification and other requirements
> imposed by applicable law or network rules.

Following receipt of notice from a merchant regarding its chosen transaction fee,

it is Access's standard business practice that the appropriate customer service representative log

the communication or correspondence into an electronic logbook.  Declaration of Teri Friedler ¶

4 ("Friedler Decl.") (attached hereto as Exhibit 2); Dentlinger Decl. ¶ 12.  That customer service

representative also routinely logs into the computer system any actions taken by Access

concerning the customer account.  Friedler Decl. ¶ 5.  Access maintains these logs in the normal

and regular course of business. *Id.* ¶ 6.

In addition to logging communications and correspondence, when a merchant

contacts Access to change the ATM surcharge fee, the customer representative sends a fee-notice

sticker to that merchant. *Id.* ¶ 7.  Specifically, the customer representative prints and sends to the

merchant new fee-notice stickers with instructions explaining in detail how the customer should

affix the stickers prominently upon the ATM. *Id.*  At the same time, the customer representative

also sends instructions to the merchant about how to reprogram the ATM so that the electronic

screen matches the fee-notice sticker. *Id.* Access utilizes these procedures and policies to ensure that surcharge fee-notice and reprogramming instructions are promptly sent to ATM owners. *Id.* ¶ 8.

Access business records indicate that on April 3, 2001, "Carol" of Gooding's Supermarkets called Access and requested that Access change the surcharge fee for the ATM at issue from $1.50 to $2.00.[2]  Friedler Decl. ¶10 and Exhibit A thereto.  On April 4, the next day, Access sent to Gooding's new stickers and programming instructions for the ATM. *Id.*  On April 8, 2003 Gooding's again called Access and requested that Access re-send the programming instructions for the ATM by facsimile. *Id.*  Access faxed the instructions that same day. *Id.* Accordingly, Access complied with all policies and procedures designed to ensure that merchants received the stickers and programming instructions for their ATMs.

On or about July 5, 2002, Plaintiff used the ATM at Gooding's Lake Buena Vista store. *See* Plaintiff's Objections and Responses to E*TRADE Access's First Set of Interrogatories at Response 1 ("Interrog. Responses") (attached as Exhibit 5).  At the time of Plaintiff's transaction, the ATM contained two fee-notice stickers prominently displaying that customers making ATM transactions would be charged a fee of $2.00. *See* Supplemental Declaration of Anthony Marcus in Support of Gooding's Supermarket's Motion for Summary Judgment ¶¶ 6 & 7.  Plaintiff entered his card into the machine and commenced his transaction. Notwithstanding the two fee-notices stating the transaction fee would be $2.00, the electronic screen of the ATM indicated that the fee would be $1.50.  Interrog. Responses 1 & 3.  Plaintiff

---

[1]     A copy of this contract was attached to Gooding's Answer in this action.

[2]     Gooding's records confirm that Access's log is entirely accurate; in discovery, Gooding's produced copies of *both* the April 3, 2001 letter with the programming instructions (attached hereto as Exhibit 3), *and* the April 8, 2001 fax with the reprogramming instructions (attached hereto as Exhibit 4).

consummated his transaction and received a receipt stating that he had been charged a fee of $2.00.  Interrog. Response 3.

On February 26, 2003, Plaintiff filed his amended class action complaint against Gooding's and Access alleging violations of the EFTA, 15 U.S.C. §§ 1693 *et seq.*  On June 4, 2003, Gooding's filed its Answer admitting that one of its employees made a mistake in programming the ATM, resulting in the discrepancy between the two fee-notice stickers and the electronic screen.  On July 7, 2003, Access answered by denying all allegations against it.  Both Access and Gooding's opposed Plaintiff's efforts for class certification.  Magistrate Judge Glazebrook issued a Report and Recommendation denying class certification in this matter on February 5, 2004.  This Court then fully accepted and adopted Magistrate Judge Glazebrook's Report and Recommendation on March 16, 2003.

## ARGUMENT

### I.   STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); Fed. R. Civ. P. 56(c).  To prevail, the moving party may: (1) show that the non-moving party has no evidence to support its case, or (2) present "affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial."  *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437-38 (11th Cir.1991) (en banc).  *See also Lewis v. ACB Business Servs., Inc.*, 135 F.3d 389 (6th Cir. 1998) (bona fide error defense under the Fair Debt Collections Practices Act appropriate for summary judgment); *Jenkins v. Heintz*, 124 F.3d 824 (7th Cir. 1997) (same).

## II.  UNDER THE EFTA, ACCESS WAS NOT RESPONSIBLE FOR PROGRAMMING THE ATM AT ISSUE

Under the EFTA, the operator of an ATM imposing a fee must provide notice of the amount of such fee.  15 U.S.C. § 1693b(d)(3)(A).  As previously indicated, Access does not own or operate the ATM in dispute.  To the contrary, the ATM is owned and operated by Gooding's itself.  *See* 15 U.S.C. § 1693b(d)(3)(D)(i) (ATM operator means any person who "operates an automated teller machine at which consumers initiate electronic funds transfers"); *Emerson v. Theil College*, 296 F.3d 184, 189 (3d Cir. 2002) (operate means "to control or direct the functioning of and to conduct the affairs of"); *Neff v. American Dairy Queen Corp.*, 58 F.3d 1063, 1066 (5th Cir. 1995) (operate means "to put in operation" or "[t]o conduct the affairs of" or "manage").  Accordingly, Gooding's is responsible for complying with EFTA's posting and notice requirements – it alone has the *sole discretion* (1) to charge an access fee; (2) to set the amount of the charge; and (3) to comply with all posting, consumer notification and other requirements imposed by applicable law.  *Id.* ¶¶ 9-11.

Because Gooding's participates in Access's ATM network, Gooding's is allowed to display the "E*TRADE" service mark on its ATM.  Access's *only* relation to the ATM at issue is to provide a network to Gooding's over which the ATM sends electronic data to connect the ATM to the consumers' banks, and to send fee-notice stickers and programming instructions to Gooding's.  *Id.* ¶ 8.

As with all merchant customers, Access promptly mailed Gooding's a sticker disclosing the $2.00 transaction fee and written instructions for programming the transaction fee in the ATM.  *Id.* ¶ 12; Friedler Decl. ¶ 10.  It is undisputed that Access sent programming instructions to Gooding's over *a year* before Plaintiff used the ATM.  Gooding's admits that *its* clerical employee failed to reprogram the ATM in accordance with the instructions it received

from Access. As the owner of its ATM, Gooding's was responsible for posting the sticker and

programming the ATM. Dentlinger Decl. ¶ 12.

Notwithstanding that Access neither owns nor operates the ATM at issue, Plaintiff

alleges Access is liable to him, in the amount of $2.00 plus statutory damages and attorney's

fees, for the alleged erroneous on-screen fee notice.[3] Such claim is contrary to the EFTA and

fails as a matter of law.

## III.    ANY ERROR IN THE ELECTRONIC FEE-NOTICE WAS A BONA FIDE ERROR

Even if the alleged mistake of which Plaintiff complains is attributable to Access

– which it is not – Access is shielded from liability by the EFTA's "bona fide error" defense.

The EFTA provides that a person is not responsible for a violation of the EFTA if the violation is

the result of a "bona fide error":

> [A] person may not be held liable in any action brought under this section
> for a violation of this subchapter if the person shows by a preponderance
> of the evidence that the violation was not intentional and resulted from a
> bona fide error notwithstanding the maintenance of procedures reasonably
> adapted to avoid any such error.

15 U.S.C. 1693m(c).[4] This provision is applicable to Access – uncontroverted evidence shows

that the programming error was an unintentional bona fide error made notwithstanding Access

procedures adapted to avoid such error.

---

[3]      For a case like this, EFTA provides for the recovery of actual damages and statutory
damages between $100 and $1,000. Under the facts of this case, Plaintiff's *maximum* recovery
of actual and statutory damages is $1002.00. In addition to actual and statutory damages, the
EFTA permits the recovery of reasonable attorney's fees. Plaintiff's Interrogatory Responses
indicate that, as of April 2, 2004, he incurred attorney's fees exceeding $140,000. Interrog.
Response 8.

[4]      Although there is only one reported case discussing bona fide error under the EFTA, that
provision is substantially similar to the unintentional or bona fide error provision of TILA, a
statute that has virtually identical liability provisions as the EFTA. *See* 15 U.S.C. § 1640(c).

There can be no doubt that the programming error at issue was made without any intention on Access's behalf.  Gooding's admits that *its* employee – not Access – made the unintentional error despite receiving fee-notice stickers and programming instructions from Access. [5]  *See Gilstrap v. Heights Fin. Corp.*, No. 85-1385, 1986 WL 27587, *2  (C.D. Ill. Aug. 28, 1986) ("Examples of a bona fide error include, but are not limited to, clerical, calculation, computer malfunction and programming, and printing errors, except that an error of legal judgment with respect to a person's obligations under this subchapter is not a bona fide error"); *Henning v. Daniels*, 653 F.2d 104 (4th Cir. 1981) (finding unintentional error under TILA where defendants uncontroverted testimony was that the omission was an oversight); *Bailey v. Defenbaugh & Co. of Cleveland, Inc.*, 513 F. Supp. 232 (N.D. Miss. 1981) (finding unintentional error undere TILA where defendant did not deliberately omit signature).

Additionally, at all times relevant to this matter, Access maintained procedures designed to ensure that Access promptly provides merchants with fee-notice stickers and instructions describing how to reprogram on-screen notices so they match the fee charged by the merchant to ATM users.  Friedler Decl. ¶ 8.  Indeed, Access followed these procedures precisely by mailing a sticker and instructions explaining how to reprogram the on-screen notice.  *Id.* ¶ 11.  Access sent the sticker promptly upon receiving Gooding's request.  *Id.* ¶ 10.  When Gooding's made a second request for the instructions, Access faxed the instructions to Gooding's that same day. *Id.*

It is undisputed that Access complied with its procedures designed to ensure that merchants receive fee-notice stickers and programming instructions for their ATMs – Gooding's

---

[5]     Access understands that on July 2, 2004, Gooding's is filing a Motion for Summary Judgment asserting that its error in reprogramming the machine is excused by the bona fide error defense also.

admits it received the sticker and the instructions sent by Access. *Doubet v. USA Fin. Servs., Inc.*, 714 F. Supp. 980, 983 (C.D. Ill. 1987) (granting summary judgment on bona fide error defense where defendant reviewed the paperwork to ensure accuracy).

The error about which Plaintiff complains was unintentional on Access's part and occurred notwithstanding Access's maintenance of procedures designed to prevent the sort of harm of which Plaintiff complains. Accordingly, Plaintiff cannot prevail on its claims against Access as a matter of law and those claims must be dismissed.

### CONCLUSION

For the foregoing reasons, E*TRADE Access, Inc. respectfully requests that the Court grant its Motion for Summary Judgment and dismiss Plaintiff's claims against Access.

Respectfully submitted,

Robert M. Brochin
Florida Bar No. 0319661
MORGAN, LEWIS & BOCKIUS LLP
McLean, Virginia 22102
5300 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2339
Telephone:    305.415.3456
Facsimile:    305.415.3001

Douglas P. Lobel (*pro hac vice*)
David A. Vogel (*pro hac vice*)
John F. Henault (*pro hac vice*)
ARNOLD & PORTER LLP
1600 Tysons Boulevard
Suite 900
McLean, Virginia 22102
Telephone:    703.720.7000
Facsimile:    703.720.7399

Counsel for Defendant E*TRADE Access, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been sent to the following persons by US Mail on this 1st day of July 2004:

*Counsel for Plaintiff, Gilbert Polo:*

Brian G. Pincket
(Florida Bar No. 501425)
MILAM & HOWARD, P.A.
50 N. Laura Street, Suite 2900
Jacksonville, Florida  32202
Telephone:     (904) 357-3660
Facsimile:     (904) 357-3661

Stacy Bardo
Lance Rafael
THE CONSUMER ADVOCACY CENTER, P.C.
25 East Washington, Suite 1805
Chicago, IL  60602
Telephone:     (312) 782-5808
Facsimile:     (312) 377-9930

*Counsel for Defendant, Gooding's Supermarkets:*

T. Todd Pittenger
   (Florida Bar No. 0768936)
LOWNDES, DROSDICK, DOSTER,
  KANTOR & REED, P.A.
215 North Eola Drive
Orlando, Florida  32802-2809
Telephone:     (407) 843-4600
Facsimile:     (407) 423-4495

John F. Henault Jr.

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

GILBERT POLO,                                    NO: 6:03-CV-134-ORL-28 JGG

        Plaintiff,

v.

GOODING'S SUPERMARKETS, INC. *et al.*,

        Defendants.

_____/

## DECLARATION OF DALE DENTLINGER

I, Dale Dentlinger, hereby declare as follows:

1.     I am President of E*TRADE Access, Inc. ("Access").  I have served in this position at Access since November, 2001.  I have personal knowledge of all matters discussed below, based on my role at Access and/or my 25 years in the ATM industry.  I submit this declaration in support of Access's opposition to the Plaintiff's motion for class certification.

### Automated Teller Machines — "ATMs"

2.     An ATM is a stand-alone, computer-based device with a cash storage system inside that can be installed at any fixed installation, such as a building or a kiosk, that permits a consumer to conduct banking transactions even though far away from his or her financial institution ("bank").

3.     A consumer uses an ATM in the following manner.  If a consumer's account is accessible through ATMs, the consumer's bank will have issued to the consumer an ATM card — a credit-card-sized plastic card built with a magnetic strip on the back —



that has a unique card number.  The consumer inserts this card into a slot on the ATM.

Using a keypad and (typically) 8 function keys built into the ATM, the consumer first enters

his or her Personal Identification Number ("PIN").  Then the consumer selects a variety of

possible banking transactions, including making cash withdrawals, checking balances,

depositing checks, or transferring funds between accounts.  ATMs permit a consumer to

obtain a paper receipt after the transaction.

       4.     Most ATMs can entertain transactions with accounts at the vast

majority of banks.  Both ATM owners and banks connect their ATMs and banking systems,

respectively, to any number of regional or nationwide ATM networks (such as Plus, Cirrus,

and others).  These networks permit transactions to occur at any ATM on the network with

any bank on the network.

**Merchant-Owned ATMs Branded With The "E\*TRADE" Service Mark**

       5.     Currently, Access provides services to about 15,000 ATMs located

throughout all 50 states.

       6.     The vast majority of these ATMs are owned and operated by

approximately 8,000 independent merchants.  For example, the "E\*TRADE"-branded ATM

at the Gooding's Supermarket store in Orlando, Florida, is owned and operated by

Gooding's.

       7.     As established in Access's contract with each merchant, the merchant

has full and exclusive control over the ATMs.  For example:

- The merchant must own or lease the actual real property where the ATM is located.

- The merchant also has the responsibility of keeping the space around the ATM in safe, neat and orderly condition, for assuring unobstructed access to the ATM, and for maintaining security at the ATM location.

- The merchant must either buy or lease the ATM equipment.

- The merchant also is responsible for filling the ATMs regularly with a sufficient amount of cash to dispense.

- The cash in the ATM is the property and responsibility of the merchant.

- The merchant is required to keep an adequate supply of paper in the ATM for receipts and for balance inquiries.

- The merchant is responsible for providing proper insurance against loss, damage, theft, or destruction of the ATM.

8. Access, through other third-party vendors, provides electronic transaction processing services to the merchants that own and operate the ATMs. For each transaction, the ATM sends electronic data through phonelines to a processor, which then routes the information to an ATM network, and then finally to the consumer's bank.

**Transaction Surcharge Fees**

9. The merchant also has sole discretion whether to charge, and how much to charge for, a transaction fee, which Access calls a "surcharge fee," and for complying with the posting and notice requirements in the Electronic Funds Transaction Act ("EFTA") relevant to such surcharge fees.

10. The merchant chooses whether a surcharge fee will be charged at all. If the merchant chooses to impose a surcharge fee, then the merchant has discretion as to the amount of the surcharge fee. For example, in Access's contract with Gooding's, the contract states:

> 4. <u>Transaction Surcharges.</u>  Location [Gooding's] may impose
> a transaction surcharge fee upon ATM transactions . . . .
> Location may establish the initial surcharge amount . . . and
> may increase or decrease the surcharge fee in its sole
> discretion.

I understand that a copy of Access's contract with Gooding's is attached to Gooding's

Answer filed in this lawsuit.

     11.     Access's contracts with all of its merchant customers impose the

obligation to comply with the posting and electronic notice requirements of EFTA solely on

the merchants.  For example, Access's contract with Gooding's states:

> 4. <u>Transaction Surcharges.</u> . . .  Location [Goodings] shall
> comply with all posting, consumer notification and other
> requirements imposed by applicable law or network rules.

     12.     Access's involvement in the surcharge fee is merely limited to mailing

to the merchant both the posted notice (a sticker) and instructions for how to program the

electronic notice into the ATM.  It is the obligation of the merchant to post the sticker on or

near the ATM, and to physically reprogram the ATM.

**<u>Compliance with EFTA Posting and Notice Requirements</u>**

     13.     Access has no information that would permit it to determine if any

merchant failed to post a sticker on, or program the electronic notice in, any merchant-owned

ATM.

     14.     The entire responsibility for complying with EFTA lies with each

merchant.  Access has no reasonable way of knowing whether a merchant in fact both posted

a notice and correctly programmed the ATM, other than physically inspecting the ATMs on

site.

15.     Furthermore, even if someone could inspect every merchant-operated ATM, that analysis would only reveal ATMs *today* that might not be in compliance with EFTA. No information exists that would alert Access that a merchant-owned ATM might have been noncompliant for some period since February 2002 but have been corrected since then.

16.     In any event, Access has never had occasion to address these problems before because they have never occurred, so far as Access is aware. Access has never heard or received any information about *any* ATM that Access services having either a posting or an electronic notice that misstated the amount of the transaction surcharge fee — that is, until Access received Gilbert Polo's Complaint. If indeed the ATM at the Gooding's Supermarket was wrongly programmed and the electronic notice disclosed a surcharge fee of $1.50 instead of $2.00, then this would have been the very first and the only instance of the problem occurring at any "E*TRADE"-branded ATM of which I am aware.

**Identities of Consumers**

17.     Access does not have information identifying consumers who use the ATMs that Access services.

18.     For each ATM transaction, Access's network captures only limited information about the transaction. The name or address of the consumer is not available.

19.     The ATM card number does indirectly permit identification of the consumer, but only by contacting the consumer's bank. The first six digits of each ATM card number is a unique identifier of the bank, known to the ATM network (e.g. Cirrus) over which the transaction occurs. The remaining digits on the card have meaning only to the

bank; they specify the consumer's particular account.  In order to determine the name and address of the consumer based on the ATM card number, one would have to: (1) determine the identity of the bank based on the particular bank number; and then (2) contact the bank and inquiring about the customer's name and address based on the remaining digits of the card.  Because ATMs can accept ATM cards issued by many banks in foreign countries, it is entirely possible that the inquiry I describe would have to include banks in other countries.

20.     No automated method exists to obtain a consumer's name and address based on the ATM card number.  ATM networks are not designed to pass a consumer's name and address from the bank to an inquiring processor or other third party.  Based on my long experience in the ATM industry, the only way I know of to determine the names and addresses of consumers based on a list of ATM card numbers is to manually contact ATM networks and then the banks for each and every different ATM card number.  However, banks would only provide the information under Court order because privacy laws prohibit banks from freely providing the information.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  Executed this 7th day of August, 2003 in Arlington, Virginia.

Dale Dentlinger

**Incident ID:** 494178

**Customer:** 535856

**Contact:**

**Customer Information:**
Terminalld: TD000544
Phone: (407) 827-1200
Company: Gooding's of Lake Buena Vista
Type: Customer - Location
Status: Active
Contact: Jonathan Gooding
Address: 12521 SR 535
City/State: Lake Buena Vista FL   United States
Post Code: 32839

**Recall:**

**Description:** Surcharge

**Type:** Customer Service

**Assigned To:** Romain Kanege

**Product:** Surcharge

**Status:** Closed - Resolved

**Priority:** 3 - Medium

**Activity:** Inbound

**Keywords:** Carol

**Work Notes:**
**** Entered By: rkanege @ Tuesday, April 03, 2001 1:14:45 PM ****
Carol called in to request surcharge changed to $2.00
Advsied her I'll make the request to the processor, then I'll mail her a confirmation letter with a new $2.00 sticker.

**** Entered By: rkanege @ Tuesday, April 03, 2001 6:16:24 PM ****
Changed surcharge amount to $2.00 in the ATM tab. Faxed request for surcharge change to ACS

**** Entered By: rkanege @ Wednesday, April 04, 2001 12:04:10 PM ****
I sent new surcharge letter, set up instructions and sticker. Awaiting response from ACS

**** Entered By: rkanege @ Thursday, April 05, 2001 12:21:35 PM ****
I received confirmation of surcharge change from ACS.Effective 4/5.

**** Entered By: astevens @ Sunday, April 08, 2001 7:55:20 AM ****
customer called in needing to reprogram the surcharge in the terminal, she hadn't gotten her instructions or stickers yet. faxed her reprogram instructions to 407-827-1219

**Incident Details:**
Balancing:

Service-Technical:

Residual:

Non Active:

**Audit Log:**

| Entered Date | Status | Priority | Source | Assigned To | Insert By |
|---|---|---|---|---|---|
| 2001-04-03 13:14:44 | Open | 3 - Medium | Inbound | rkanege | rkanege |
| 2001-04-03 18:16:21 | Open | 3 - Medium | Inbound | rkanege | rkanege |
| 2001-04-04 12:04:10 | Awaiting Respon | 3 - Medium | Inbound | rkanege | rkanege |
| 2001-04-05 12:21:35 | Closed - Resolv | 3 - Medium | Inbound | rkanege | rkanege |
| 2001-04-08 07:55:19 | Closed - Resolv | 3 - Medium | Inbound | rkanege | astevens |

**Resolution Codes:**
Res. Code 1
Res. Code 2
Res. Code 3
Res. Code 4

A 000065



UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

GILBERT POLO,                                    NO: 6:03-CV-134-ORL-28 JGG

               Plaintiff,

v.

GOODING'S SUPERMARKETS, INC. *et al.*,

               Defendants.
_____/

## DECLARATION OF TERI FRIEDLER

I, Teri Friedler, hereby declare as follows:

1.       I am a Customer Relations Manager for E*TRADE Access, Inc. ("Access"). I have been employed at Access since December 2001, and have served as Customer Relations Manager since September 2003. I have personal knowledge of all matters discussed below, based on my role at Access. I submit this declaration in support of Access's Motion for Summary Judgment in the above-captioned case.

**Customer Relations Policies and Practices**

2.       I train, supervise and assess the performance of customer relations representatives at Access's headquarters in Arlington, Virginia. I am familiar with all aspects of the job descriptions and performance requirements of customer relations representatives at Access.

3.       I supervise Access's procedures, policies and requirements relating to customer relations at Access, including procedures and policies relating to communication and correspondence with customers regarding Access's electronic transaction processing



services ("Services") offered through automated teller machines ("ATMs") that are owned and operated by independent merchants. Among these procedures, I have designed and implemented procedures for Access customer relations representatives to ensure that customers receive instructions on how to reprogram their ATMs to reflect the correct surcharge in on-screen notices.

4.      A standard business practice of Access customer relations representatives is to log all communications and correspondence between customers and Access. Whenever Access customer relations representatives communicate or correspond with a customer, the customer relations representatives type contemporaneous notes into a computer system concerning the substance of the communication or correspondence.

5.      Another standard business practice of Access customer relations representatives is to type notes into the computer system concerning any actions taken by Access concerning the customers account.

6.      All records of customer relations representative's notes are maintained in the normal and regular course of Access's business.

7.      In addition to logging communications and correspondence, when a customer contacts Access to change and ATM surcharge fee, customer relations representatives send notices to the customer. Specifically, customer relations representatives print and send to the customer new fee-notice stickers with instructions explaining in detail how the customer should affix the stickers prominently upon the ATM. At the same time, the customer relations representatives also send instructions about how to reprogram the ATM.

2

8.      The aforementioned procedures, policies and requirements are designed to ensure that surcharge fee stickers and reprogramming instructions are promptly sent to ATM owner-operators upon request of owner-operators.

**Gooding's Request For A Surcharge Fee Change**

9.      Attached to this declaration as Exhibit A is a print-out of notes recorded in Access's computer system. These notes relate to Gooding's ATM located at 12521 S.R. 535, Lake Buena Vista, Florida. I have reviewed these notes carefully.

10.     The notes show that:

- On April 3, 2001, Gooding's called Access and requested that Access change the surcharge from $1.50 to $2.00, and Access mailed on April 4, 2001 both new stickers and instructions to reprogram the on-screen notice;

- Gooding's called Access on April 8, 2001, saying Gooding's needed the reprogramming instructions resent. The notes reflect that Access faxed the instructions that day to Gooding's.

11.     Access's customer service representatives appear to have followed all policies, practices and procedures with regard to Gooding's account without exception.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed this 29th day of June, 2003 in Arlington, Virginia.

_____
Teri Friedler

3



April 3, 2001

Gooding's of Lake Buena Vista
12521 SR 535
Lake Buena Vista, FL 32839

Dear  Jonathan Gooding,

Please accept this letter as confirmation of your request to implement a surcharge fee on your
E*TRADE® ATM.

Federal Guidelines require that every ATM terminal that surcharges post a notice of that
particular surcharge on the ATM.  We are enclosing the surcharge notice for your ATM
and ask that you remove the backing and press the notice below or directly above the
cash-dispensing tray on the front door of the ATM.

You are also required to activate the "surcharge screen" on the ATM itself. Please find
enclosed a complete step by step list of instructions for activating the surcharge screen. If
you encounter any problems regarding this, please contact Customer  Support at 1-800-
783-8366.

X - 2276
for supplies

Best Regards,


E*TRADE ATM Customer Support
Enclosure

$ 39 per 4 rolls

G000028

3



E\*TRADE ATM

E\*TRADE ATM
13190 SW 68TH PARKWAY,
SUITE 200
PORTLAND OREGON 97223
800-783-8366
503-639-1267
503-670-0820 FAX
http://www.etrade-atm.com

## Surcharge Reprogramming Instructions

1. Press the **Blue** key and the **1** key at the same time
2. Press **Management Functions**
3. Enter the Master Password (**639126** or **123456**)and press **Enter**
4. Press **Terminal Configurations**
5. Press **Set Terminal Parameters**
6. Press **Surcharge Mode**
7. Press **Enable**
8. Press **Surcharge Amount**
9. Enter your new Surcharge Amount  $2.00
10. Press the green OK button
11. Press **Exit**
12. Press **Exit** again
13. Press **Exit, Exit**
14. Press **Customer Transactions**

Be sure that you have a SURCHARGE sticker, that accurately reflects the amount you are charging and is visible to customers using the ATM.

Call us and make sure that we have received a confirmation from your processor so that you will receive credit for your new surcharge amount.

G000029

**CARD CAPTURE SERVICES, INC.**
13190 S.W. 68TH PARKWAY, SUITE 200
PORTLAND, OREGON 97223
800 760 0366
503 639 1267
503 624 1570 /ax
http://www.atmcash.com

## CCSExpress ATM

### SURCHARGE REPROGRAMMING INSTRUCTIONS

1. Press the blue key and the one (1) key at the same time.
2. Press Management Functions
3. Enter Master Password, 639126, press OK
4. Press Terminal Configurations
5. Press Set Terminal Parameters
6. Press Surcharge Mode
7. Press Enable
8. Press Surcharge Amount
9. Enter your surcharge amount.
10. Press OK
11. Press Exit
12. Press Exit
13. Press Change Messages
14. Press Surcharge Screen
15. Press Will Surcharge
16. Press Exit
17. Press Surcharge Owner
18. Press Change
19. Enter PUEBLO BANK & TRUST*** (see instructions below)
20. Press OK
21. Press Exit
22. Press Terminal Owner
23. Press Change
24. Enter PUEBLO BANK & TRUST ***(see instructions below)
25. Press OK
26. Press Exit, Exit, Exit, Exit, Exit
27. Press Customer Transactions

***Press the blue key once; press the number 7 key once, then press the RIGHT ARROW key to lock in the letter P. Press the blue key once, press the number 8 key twice, then press the RIGHT ARROW key to lock in the letter U. Press the blue key once, press the number 3 key twice, then press the RIGHT ARROW key to lock in the letter E. Press the blue key once, press the number 2 key twice, then press the RIGHT ARROW key to lock in the letter B. Press the blue key once, press the number 5 key three times, then press the RIGHT ARROW key to lock in the letter L. Press the blue key once, press the number 6 key three times, then press the RIGHT ARROW key to lock in the letter O. Press the blue key once, press the number 1 key three times, then press the RIGHT ARROW key to lock in a space. Press the blue key once, press the number 2 key twice, then press the RIGHT ARROW key to lock in the letter B. Press the blue key once, press the number 2 key once, then press the RIGHT ARROW key to lock in the letter A. Press the blue key once, press the number 6 key twice, then press the RIGHT ARROW key to lock in the letter N. Press the blue key once, press the number 5 key twice, then press the RIGHT ARROW key to lock in the letter K. Press the blue key once, press the number 1 key three times, then press the RIGHT ARROW key to lock in a space. Press the blue key once, press the 0 key four times, then press the RIGHT ARROW key to lock in the &. Press the blue key once, press the number 1 key three times, then press the RIGHT ARROW key to lock in a space. Press the blue key once, press the number 8 key once, then press the RIGHT ARROW key to lock in the letter T. Press the blue key once, press the number 7 key twice, then press the RIGHT ARROW key to lock in the letter R. Press the blue key once, press the number 8 key twice, then press the RIGHT ARROW key to lock in the letter U. Press the blue key once, press the number 7 key three times, then press the RIGHT ARROW key to lock in the letter S. Press the blue key once, press the number 8 key once, then press the RIGHT ARROW key to lock in the letter T. Continue with step 20 or 25.

4

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

GILBERT POLO, individually
and on behalf of all
others similarly situated,

        Plaintiff,                    Case No.: 6:03-CV-134-ORL-28 JGG

v.

GOODING'S SUPERMARKETS,
INC., a Florida corporation, E*TRADE
BANK, a federal savings bank, E*TRADE
ACCESS, INC.,

        Defendants.

_____/

### PLAINTIFF'S OBJECTIONS AND RESPONSES TO
### E*TRADE ACCESS INC.'S FIRST SET OF INTERROGATORIES TO PLAINTIFF

      Plaintiff Gilbert Polo ("Polo") hereby objects and responds to Defendant E*Trade

Access, Inc.'s ("E*Trade") First Set of Interrogatories to Plaintiff as follows:

### GENERAL OBJECTIONS

      1.     Polo objects to each and every Interrogatory to the extent it seeks information

protected by the attorney-client privilege or work product doctrine.

      2.     Polo objects to each and every Interrogatory to the extent it seeks information that

is neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the

discovery of admissible evidence.

      3.     By responding to an Interrogatory, Polo does not admit that the information

provided is relevant or otherwise admissible as evidence at trial or for any other purpose.  Polo



reserves the right to object to the admissibility of any and all information provided in response to the Interrogatories on any and all grounds.

    4.    Polo objects to E*Trade's Interrogatories, and to any instruction or definition contained therein, to the extent that the Interrogatories, instructions or definitions purports to require Polo to respond to the Interrogatories in a manner other than required by the Federal Rules of Civil Procedure and any applicable Local Rule.

## RESERVATION OF RIGHTS

    Polo's investigation of the facts and circumstances surrounding this action is ongoing. These objections and responses are based on currently available information. Polo reserves the right to supplement and/or amend these objections and responses at a later time if additional information is discovered in the future.

## RESPONSES

1.    Gilbert Polo
c/o Milam Howard Nicandri Dees & Gillam, P.A.
50 N. Laura St., Suite 2900
Jacksonville, FL 32202

Mr. Polo used the Gooding's ATM on or about July 5, 2002. The touch-screen on the Gooding's ATM informed Mr. Polo that he would be charged a fee of $1.50 if he continued with the transaction. Mr. Polo consented to paying the fee of $1.50 by pressing the appropriate location on the touch-screen of the Gooding's ATM.

Other people who used the Gooding's ATM during the one year period prior to the filing of this action.

Current and former employees and/or agents of Gooding's and E*Trade with knowledge of any matter at issue in this action.

2.    Gilbert Polo – See response to Interrogatory numbered 1.

Other people who used the Gooding's ATM during the one year period prior to the filing of this action. It has not been determined at this time which people will be called to testify in this action.

Current and former employees and/or agents of Gooding's and E*Trade with knowledge of all matters at issue in this action including, but not limited to, the relationship between Gooding's and E*Trade, the disclosures on the Gooding's ATM, the programming of the Gooding's ATM, and the policies and procedures of Gooding's and E*Trade regarding the actions taken by them to ensure compliance with all laws applicable to the operation of the Gooding's ATM. It has not been determined at this time which employees and/or agents will be called to testify in this action.

Each and every fact witness that will be called to testify by any other party to this action.

3.      The touch-screen of the Gooding's ATM informed Plaintiff that he would be charged a fee of $1.50 if he continued with the transaction. Plaintiff agreed to pay the $1.50 fee. Notwithstanding the $1.50 disclosure, Plaintiff was charged $2.00 for the transaction. The Gooding's ATM failed to contain the disclosures required by law. Notwithstanding the $1.50 disclosure, the receipt received by Plaintiff from the Gooding's ATM reflected that Plaintiff was charged $2.00.

See response to Interrogatory numbered 2 above.

4.      Wachovia (f/k/a) First Union
        Charlotte, NC

5.      Wachovia did not reimburse, credit, waive or otherwise reduce the transaction fee Polo agreed to pay for using the Gooding's ATM.

6.      Polo objects to Interrogatory numbered 6 on the grounds that it is overbroad, unduly burdensome and oppressive, and that it seeks information that is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Polo further objects to the extent that it seeks information protected by the attorney-client privilege and work-product doctrine.

7.      None.

3

8.    The maximum statutory damages available under EFTA.

All amounts paid by each member of the class to use the Gooding's ATM.

All reasonable attorneys' fees and costs which at the present time are in excess of $140,000.00.

Respectfully Submitted,

_____

Brian G. Pipoket
Florida Bar No.: 501425
MILAM HOWARD NICANDRI DEES
& GILLAM, P.A.
50 N. Laura Street, Suite 2900
Jacksonville, Florida 32202
Telephone: (904) 357-3660
Facsimile: (904) 357-3661

Attorneys for Plaintiff

and

Lance A. Raphael, Esquire
Stacy Bardo, Esquire
The Consumer Advocacy Center
25 East Washington, Suite 1805
Chicago, IL 60602
Telephone: (312) 782-5808
Facsimile: (312) 377-9930

4

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been furnished by facsimile and U.S. Mail this 2 day of April 2004 to:

> Todd Pittenger
> Lowndes, Drosdick, Doster, Kantor & Reed
> 215 North Eola Drive
> Orlando, Florida 32801
>
> Attorneys for Defendant
> Gooding's Supermarkets, Inc.

and

> Douglas P. Lobel
> David A. Vogel
> Arnold & Porter
> 1600 Tysons Blvd., Suite 900
> McLean, VA 22102
>
> Robert M. Brochin
> Morgan, Lewis & Bockius LLP
> 5300 Wachovia Financial Center
> 200 South Biscayne Boulevard
> Miami, FL 33131
>
> Attorneys for Defendants
> E*Trade Access, Inc.

ATTORNEY

5