UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**GILBERT POLO,**                                                       NO: 6:03-CV-134-ORL-28 JGG

    **Plaintiff,**

v.

**GOODING'S SUPERMARKETS, INC.** *et al.*,

    **Defendants.**
_____/

### E*TRADE ACCESS, INC.'S OPPOSITION TO
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff's summary judgment motion should be denied because E*TRADE Access ("Access") is not the "operator" of the ATM at issue under the Electronic Funds Transfer Act ("EFTA"). Even if Access were considered an "operator," Plaintiff is precluded from recovering from Access as a matter of law based upon the EFTA's Bona Fide Error defense.

### PROCEDURAL HISTORY

To recover for an alleged 50-cent overcharge at an ATM owned and operated by Defendant Gooding's Supermarkets, Inc., Plaintiff filed an amended class action complaint on February 26, 2003. Plaintiff's Complaint sought to certify a nationwide class of persons overcharged at any ATM for which Access provides electronic data processing services. On February 5, 2004, Magistrate Judge Glazebrook issued a Report and Recommendation denying class certification. This Court accepted and adopted the Report and Recommendation in full on March 16, 2004.

Plaintiff is now left with a single plaintiff lawsuit, seeking to collect actual and statutory damages under the EFTA for the alleged 50-cent overcharge. The possible damages available to plaintiff ranges from *$100.50* to a maximum of *$1002.00*. Plaintiff also seeks to

729336

recover his attorney's fees expended to recover this $100.50 to $1002.00. As of April 2004 – prior to the mediation and summary judgment motions – Plaintiff claimed his attorney's fees exceeded *$140,000*.

## COUNTER STATEMENT OF UNDISPUTED FACTS

### Automated Teller Machines

1. An ATM is a stand-alone, computer-based device with a cash storage system inside that can be installed at any fixed installation, such as a building or a kiosk. ATMs permit consumers to conduct banking transactions even though far away from his or her financial institution ("bank"). Declaration of Dale Dentlinger at ¶ 2 (filed on August 11, 2003 in support of Access's Opposition to Class Certification and attached to Access's July 2, 2004 Motion for Summary Judgment as Exhibit 1) ("Dentlinger Decl.")

2. A consumer uses an ATM in the following manner. If a consumer's account is accessible through ATMs, the consumer's bank will have issued to the consumer an ATM card — a credit-card-sized plastic card built with a magnetic strip on the back — that has a unique card number. The consumer inserts this card into a slot on the ATM. Using a keypad and (typically) 8 function keys built into the ATM, the consumer first enters his or her Personal Identification Number ("PIN"). Then the consumer selects a variety of possible banking transactions, including making cash withdrawals, checking balances, depositing checks, or transferring funds between accounts. ATMs permit a consumer to obtain a paper receipt after the transaction. Dentlinger Decl. ¶ 3.

3. Most ATMs can entertain transactions with accounts at the vast majority of banks. Both ATM owners and banks connect their ATMs and banking systems, respectively, to any number of regional or nationwide ATM networks (such as Plus, Cirrus, and others).

These networks permit transactions to occur at any ATM on the network with any bank on the network. Dentlinger Decl. ¶ 4.

**The Access Network**

4. Access operates a nationwide electronic network of ATMs.[1] *See* E*TRADE Group, Inc. Dec. 31, 2001 Form 10-K at pp. 5 & 11 (attached to Plaintiff's Motion for Summary Judgment as Exhibit 2). Through this network, Access provides electronic transaction processing services to ATMs subscribing to the network. Dentlinger Decl. ¶ 4.

5. For each network transaction, the ATM sends electronic data through phone lines to a processor, which then routes the information to the Access network, and then finally to the consumer's bank. Dentlinger Decl. ¶ 8.

6. Access does not own the majority of ATMs subscribing to its network services. Dentlinger Decl. ¶ 6. Rather, the *only* relationship between Access and ATMs is a contract between Access and the owner of the ATM through which owner purchases from Access electronic transaction processing services on the Access network.[2] Dentlinger Decl. ¶ 7.

**Merchant-Owned ATMs Branded With The "E*TRADE" Service Mark**

7. Currently, Access provides services to about 15,000 ATMs located throughout all 50 states. Dentlinger Decl. ¶ 5.

8. The vast majority of these ATMs are owned and operated by approximately 8,000 independent merchants. For example, the "E*TRADE"-branded ATM at

---

[1] On June 30, 2004, E*TRADE sold substantially all of the assets of Access, including the assets at issue in this litigation to Cardtronics, Inc. Access sought consent from Plaintiffs to substitute Cardtronics for Access in this litigation pursuant to Federal Rule of Civil Procedure 25(c).

[2] Although Access does own and operate some ATMs, those ATMs are not at issue here – it is undisputed that Gooding's owns and operates the ATM at issue in this case.

the Gooding's Supermarket store in Orlando, Florida, is owned and operated by Gooding's. Dentlinger Decl. ¶ 6.

9. Access's only relation to the Merchant-Owned ATMs is through contract. Dentlinger Decl. ¶ 7.

10. As established in Access's contract with each merchant, the merchant has full and exclusive control over the ATMs. For example:

- The merchant must own or lease the actual real property where the ATM is located.

- The merchant also has the responsibility of keeping the space around the ATM in safe, neat and orderly condition, for assuring unobstructed access to the ATM, and for maintaining security at the ATM location.

- The merchant must either buy or lease the ATM equipment.

- The merchant also is responsible for filling the ATMs regularly with a sufficient amount of cash to dispense.

- The cash in the ATM is the property and responsibility of the merchant.

- The merchant is required to keep an adequate supply of paper in the ATM for receipts and for balance inquiries.

- The merchant is responsible for providing proper insurance against loss, damage, theft, or destruction of the ATM.

Dentlinger Decl. ¶ 7.

11. Access, through other third-party vendors, provides electronic transaction processing services to the merchants that own and operate the ATMs. For each transaction, the ATM sends electronic data through phone lines to a processor, which then routes the information to an ATM network, and then finally to the consumer's bank. Dentlinger Decl. ¶ 8.

**Transaction Surcharge Fees**

12. The merchant chooses whether a surcharge fee will be charged at all. If the merchant chooses to impose a surcharge fee, then the merchant has discretion as to the

amount of the surcharge fee. For example, in Access's contract with Gooding's, the contract states:

> 4. <u>Transaction Surcharges.</u> Location [Gooding's] may impose a transaction surcharge fee upon ATM transactions . . . . Location may establish the initial surcharge amount . . . and may increase or decrease the surcharge fee in its sole discretion.

Dentlinger Decl. ¶ 10.

13. Access's contracts with all of its merchant customers impose – solely on the merchants – the obligation to comply with the posting and electronic notice requirements of EFTA. For example, Access's contract with Gooding's states:

> 4. <u>Transaction Surcharges.</u> . . . Location [Gooding's] shall comply with all posting, consumer notification and other requirements imposed by applicable law or network rules.

Dentlinger Decl. ¶ 3.

14. Access's involvement in the surcharge fee is merely limited to mailing to the merchant both the posted notice (a sticker) and instructions for how to program the electronic notice into the ATM. Dentlinger Decl. ¶ 12.

15. It is the merchant's obligation to post the sticker on or near the ATM, and to physically reprogram the ATM. Dentlinger Decl. ¶ 12.

**Access Policies And Procedures For Ensuring Merchants Receive Appropriate Notices**

16. Access maintains policies and procedures that ensure merchants receive appropriate notices and programming instructions for their ATMs. Declaration of Terri Friedler at ¶ 3 (filed in support of Access's July 2, 2004 Motion for Summary Judgment and attached thereto as Exhibit 2) ("Friedler Decl.")

17. A standard business practice of Access customer relations representatives is to log all communications and correspondence between merchants and Access. Whenever

Access customer relations representatives communicate or correspond with a customer, the customer relations representatives type contemporaneous notes into a computer system concerning the substance of the communication or correspondence. Friedler Decl. ¶ 4.

    18.    The customer relations representatives also type contemporaneous notes into the computer system concerning any actions taken by Access regarding the customer's account. Friedler Decl. ¶ 5.

    19.    Access maintains all records of customer relations representatives' notes in the normal and regular course of business. Friedler Decl. ¶ 6.

    20.    In addition to logging communications and correspondence, when a customer contacts Access to change and ATM surcharge fee, customer relations representatives send notices to the customer. Specifically, customer relations representatives print and send to the customer new fee-notice stickers with instructions explaining in detail how the customer should affix the stickers prominently upon the ATM. At the same time, the customer relations representatives also send instructions about how to reprogram the ATM. Friedler Decl. ¶ 7.

    21.    The aforementioned procedures, policies and requirements are designed to ensure that surcharge fee stickers and reprogramming instructions are promptly sent to ATM owner-operators upon request of owner-operators. Friedler Decl. ¶ 8.

    22.    In addition to the above procedures designed to ensure that merchants receive the proper fee notice stickers and programming instructions, Access administers ATM training courses. These courses include instruction regarding the necessity of maintaining ATM surcharge disclosures in the form of an ATM fee notice to be located on the body of the ATM, and another disclosure to appear on the ATM screen. Supplemental Declaration of Anthony

Marcus at ¶ 4 (filed in support of Gooding's Supermarkets, Inc.'s July 2, 2004 Motion for Summary Judgment) ("Supp. Marcus Decl.").

23. Access also provides merchants with New Customer Service Kits and a Single Cassette Cash Dispenser Operation Manual, which contain instructions for programming the on-screen surcharge disclosure. Supp. Marcus Decl. ¶ 5.

**Compliance With EFTA Posting And Notice Requirements**

24. Access has no information that would permit it to determine if any merchant failed to post a sticker on, or program the electronic notice in, any merchant-owned ATM. Dentlinger Decl. ¶ 13.

25. The entire responsibility for complying with EFTA lies with each merchant. Access has no reasonable way of knowing whether a merchant in fact both posted a notice and correctly programmed the ATM, other than physically inspecting the ATMs on site. Dentlinger Decl. ¶ 14.

26. Furthermore, even if someone could inspect every merchant-operated ATM, that analysis would only reveal ATMs *today* that might not be in compliance with EFTA. Dentlinger Decl. ¶ 15.

27. No information exists that would alert Access that a merchant-owned ATM might have been non-compliant for some period since February 2002 but have been corrected since then. Dentlinger Decl. ¶ 15.

**The Gooding's ATM**

28. Effective March 15, 2001, Access and Gooding's entered into a Site Location Agreement. E*TRADE ATM Site Location Agreement (attached as Exhibit A to Gooding's Answer)

29.     Under the express terms of this SLA, Gooding's maintains full daily control over the ATM, including:

- Gooding's is responsible for setting the amount of the surcharge fee charged by its ATM. (SLA ¶ 4).

- Gooding's is responsible for complying with all posting, consumer notification and other requirements imposed by applicable law or network rules. (SLA ¶ 4).

- Gooding's is responsible for owning or leasing the actual property on which its ATM sits. (SLA ¶ 12).

- Gooding's is responsible for keeping the space around its ATM in a safe, neat and orderly condition. (SLA ¶ 5).

- Gooding's is responsible for ensuring that there is unobstructed access to its ATM. (SLA ¶ 5).

- Gooding's is responsible for buying or leasing its ATM. (SLA ¶ 1).

- Gooding's is responsible for connecting its ATM to telephone and electric lines at its expense. (SLA ¶ 9).

- Gooding's is responsible for filling its ATM with a sufficient amount of cash to dispense. (SLA ¶ 8).

- Gooding's is responsible for keeping an adequate supply of paper in the ATM for receipts and balance inquiries. (SLA ¶ 8).

- Gooding's is responsible for providing insurance against loss, damage, theft or destruction of its ATM. (SLA ¶ 11).

30.     On April 3, 2001, Carol of Gooding's called Access and requested that Access change the surcharge fee on the Gooding's ATM from $1.50 to $2.00. Consistent with Access's business practices, this call was logged contemporaneously into an Access computer database. Friedler Decl. ¶10 and Exhibit A thereto.

31. On April 4, consistent with Access's policies and procedures, Access set to Gooding's new stickers for the Gooding's ATM together with instructions for programming the electronic screen on its ATM. Friedler Decl. ¶10 and Exhibit A thereto.

32. On April 8, 2004, Gooding's again called Access and requested that Access fax Gooding's the instructions for reprogramming the Gooding's ATM. Access faxed the instructions that same day. Friedler Decl. ¶10 and Exhibit A thereto.

**Plaintiff Uses The Gooding's ATM**

33. On or about July 28, 2002, Plaintiff used the Gooding's ATM located at the Gooding's Supermarket in Lake Buena Vista, Florida. Plaintiff's Objections and Responses to E*TRADE Access's First Set of Interrogatories at Response 1 ("Interrog. Responses") (attached as Exhibit 5 to Access's July 2, 2004 Motion for Summary Judgment)

34. At the time Plaintiff used the Gooding's ATM, the ATM contained two fee-notice stickers prominently displaying that customers making ATM transactions would be charged a fee of $2.00. *See* Supplemental Declaration of Anthony Marcus in Support of Gooding's Supermarket's Motion for Summary Judgment ¶¶ 6 & 7.

35. Plaintiff entered his card into the Gooding's ATM and commenced his transaction. Notwithstanding the two fee-notice stickers stating the transaction fee would be $2.00, the electronic screen of the ATM indicated that the fee would be $1.50. Interrog. Responses 1 & 3.

36. Plaintiff consummated his transaction and received a receipt stating he had been charged a fee of $2.00. Interrog. Response 3.

37. On February 26, 2003, Plaintiff filed his amended class action complaint against Gooding's and Access alleging violations of the EFTA.

**Gooding's Admits It Was Responsible For The Programming Error In Its ATM**

38.  On June 4, 2003, Gooding's filed its Answer. In the Answer, Gooding's admitted that it was the operator of the ATM at issue. Gooding's Amended Answer ¶ 13.

39.  Gooding's also acknowledged that there was a discrepancy between the two fee notice stickers and the electronic screen and that this discrepancy occurred because a *Gooding's employee* was unsuccessful in programming the Gooding's ATM. Supp. Marcus Decl. ¶ 8.

## ARGUMENT

Summary judgment is only appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering summary judgment, this Court must view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant. *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999) (citing *Clemons v. Dougherty County*, 684 F.2d 1365, 1368-69 (11th Cir. 1982)).

In this case, Plaintiff cannot meet this standard. As set forth below, all record facts show that, contrary to Plaintiff's assertions, Access is not the "operator" of the Gooding's ATM under the EFTA and, therefore, is not liable for any violations of the EFTA. Even if Access were considered the "operator" of the Gooding's ATM, Plaintiff is precluded from recovering from Access under the EFTA's bona fide error exception from liability.

**I.   ACCESS IS NOT THE "OPERATOR" OF THE GOODING'S ATM UNDER THE ELECTRONIC FUNDS TRANSFER ACT**

Under the EFTA, "any ATM operator who imposes a fee on any consumer" must meet certain notice requirements. *See* 15 U.S.C. § 1693b(d)(3)(A). An ATM operator is defined

as a "person who operates an automated teller machine at which a consumer initiates an electronic funds transfer or a balance inquiry and that does not hold the account to or from which the transfer is made, or about which an inquiry is made." 12 C.F.R. § 205.16(a). The regulations impose notice requirements on the ATM operator "that imposes a fee on a consumer for initiating an electronic fund transfer or balance inquiry." *Id.* at § 205.16(b).

Plaintiff's sole basis to hold Access liable is its assertion that, as a matter of law, Access is the "operator" of the Gooding's ATM. In support, Plaintiff selectively quotes from E*TRADE SEC filings and the contract between Access and Gooding's. Plaintiff's selective quotations, however, ignore other language showing that Access is *not* the "operator" of the Gooding's ATM under the EFTA. In fact, Gooding's acknowledges that it is ***Gooding's*** – not Access – that is the "operator" of the ATM. Additionally, Gooding's – not Access – charges the consumer a transaction fee for ATM usage and, therefore, only Gooding's is responsible for all EFTA notice requirements.

### A. Access Only Provides Electronic Data Services For The Gooding's ATM

Access's only relationship to the Gooding's ATM is that Gooding's and Access have entered into a Site License Agreement whereby Access provides electronic data processing services for the Gooding's ATM though the Access electronic network. Counter Statement of Facts ¶ 28 ("CSF"). Plaintiff points to this contract as evidence that Access "operates" the Gooding's ATM under the EFTA. Plaintiff's Memorandum at 7-9. However, providing these electronic data services does not make Access the operator of the Gooding's ATM.

As set forth above, the EFTA defines an ATM operator as a "person who operates an automated teller machine at which a consumer initiates an electronic funds transfer or a balance inquiry and that does not hold the account to or from which the transfer is made, or

about which an inquiry is made." 12 C.F.R. § 205.16(a). Because this language does not provide a clear definition of the term operator, the "ordinary and natural meaning" of the word governs. *Smith v. United States*, 508 U.S. 223, 228 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning.").

Applying *Smith*, courts have defined "operate" to require a **high degree of direct, daily control** over the thing at issue:

- "to put or keep in operation" or "[t]o conduct the affairs of" or "manage," *Neff v. American Dairy Queen Corp.*, 58 F.3d 1063, 1066 (5th Cir. 1995) (individual franchisee operated individual Dairy Queen stores, not national franchisor corporation);

- "to control or direct the functioning of and to conduct the affairs of," *Emerson v. Thiel College*, 296 F.3d 184, 189 (3d Cir. 2002) (individual defendants did not direct the functioning of university);

- "to put or keep in operation"; "to control or direct the functioning of," *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 322 (D. Mass. 1997) (assistant to president of the university did not exercise "authority, control, or discretion" necessary "to be deemed an operator");

- "control over the operations of the licensee in any day-to-day fashion," *Dahlenberg v. Avis Rent A Car Sys., Inc.*, 92 F. Supp. 2d 1091, 1102-03 (D. Colo. 2000).

The record reflects that Access does not have the requisite high degree of direct control over the Gooding's ATM to make it an operator under the EFTA. In fact, the uncontroverted express terms of the contract between Gooding's and Access show that Gooding's is the *sole* operator of the Gooding's ATM:

- Gooding's is responsible for setting the amount of the surcharge fee charged by its ATM. (SLA ¶ 4).

- Gooding's is responsible for complying with all posting, consumer notification and other requirements imposed by applicable law or network rules. (SLA ¶ 4).

- Gooding's is responsible for owning or leasing the actual property on which its ATM sits. (SLA ¶ 12).

- Gooding's is responsible for keeping the space around its ATM in a safe, neat and orderly condition. (SLA ¶ 5).

- Gooding's is responsible for ensuring that there is unobstructed access to its ATM. (SLA ¶ 5).

- Gooding's is responsible for buying or leasing its ATM. (SLA ¶ 1).

- Gooding's is responsible for connecting its ATM to telephone and electric lines at its expense. (SLA ¶ 9).

- Gooding's is responsible for filling its ATM with a sufficient amount of cash to dispense. (SLA ¶ 8).

- Gooding's is responsible for keeping an adequate supply of paper in the ATM for receipts and balance inquiries. (SLA ¶ 8).

- Gooding's is responsible for providing insurance against loss, damage, theft or destruction of its ATM. (SLA ¶ 11).

Dentlinger Decl. ¶¶ 7, 10 & 11.

Plaintiff asserts that Access must be the "operator" of the ATM under the EFTA because the ATM had a sticker on it stating that Access "operates" the ATM. Plaintiff's Memorandum at 7. This allegation ignores key facts which are fatal to Plaintiff's claims. First, Gooding's admits that it – not Access – is the owner and operator of the ATM. CSF ¶ 38. Second, the sticker's use of the generic word "operates" is not intended to satisfy the legal definition of "operates" under the EFTC. Declaration of Anthony Marcus ¶ 11 (attached as Exhibit 2 to Gooding's Opposition to Class Certification). Third, as set forth above, the undisputed record reveals that Access does not have the necessary daily control over the Gooding's ATM to be deemed its "operator" under the EFTA.

### B. SEC Filings Show Access Operates A "Network," Not The Gooding's ATM

Plaintiff also points to E*TRADE's SEC filings as evidence that it "operates" the Gooding's ATM. Plaintiff's Memorandum at 7. However, the SEC filings do *not* mention individual ATMs, such as the Gooding's ATM. Rather, the SEC filing state that Access operates a *network, not individual ATMs* – "E*TRADE Access, Inc., which operates a nationwide *network* of over 11,000 ATMs." See E*TRADE Group, Inc. Dec. 31, 2001 Form 10-K at pp. 5 & 11 (attached to Plaintiff's Motion for Summary Judgment as Exhibit 2). Accordingly, these SEC filings establish that Access operates a data processing network consisting of ATMs, not that Access is the operator of the Gooding's ATM under the EFTA.

Through the Access network, Access receives electronic data transmissions through the telephone line from individual ATMs, such as the Gooding's ATM. CSF ¶ 5. After receiving this electronic data, Access routes the information to the consumer's bank to either accept or deny the consumer's withdrawal. CSF ¶ 5. The *only* relationship between Access and the Gooding's ATM is a contract between Access and Gooding's through which Gooding's purchases from Access electronic transaction processing services on the Access network. CSF ¶ 6. The fact that Access provides electronic services through the Access network does not evidence the sort of control necessary to be deemed an operator.

### C. Access Is Not Responsible For EFTA Disclosure Notices

The EFTA's implementing regulations state that only an "automated teller machine operator that *imposes a fee on a consumer* for initiating an electronic fund transfer or balance inquiry" is responsible for providing notice that a fee will be charged. 12 C.F.R. § 205.16(b) (emphasis added). As established by the uncontroverted record, Access does not

impose any fees on consumers and did not impose any fee on Plaintiff. Rather, Gooding's – the sole owner and operator of the ATM – imposed the fee on Plaintiff. CSF ¶¶ 29, 38.

Under the Gooding's / Access agreement, only Gooding's may impose a fee on consumers using the Gooding's ATM: "Location [Gooding's] may impose a transaction surcharge fee upon ATM transactions, subject to applicable law or processor/network rules." SLA ¶ 4. Moreover, Gooding's may increase or decrease this surcharge fee in its sole discretion. *Id.* Because Gooding's imposes the fee, the contract mandates that Gooding's is responsible for ensuring that its ATM complies with "all posting, consumer notification and other requirements imposed by applicable law of network rules." *Id.*

Although Access does collect a fee for its data processing services, such fee is imposed on ***Gooding's*** for the use of the Access electronic network fee, not on the consumer for use of the Gooding's ATM. Since Access is not responsible for the EFTA disclosures, summary judgment should be denied.

## II. ANY ERROR THAT OCCURRED IS SUBJECT TO THE BONA FIDE ERROR DEFENSE

The EFTA provides that a person is not responsible for a violation of the EFTA if the violation is the result of a "bona fide error":

> [A] person may not be held liable in any action brought under this section for a violation of this subchapter if the person shows by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

15 U.S.C. 1693m(c).[3] Contrary to Plaintiff's assertions, uncontroverted record evidence shows that the programming error resulting in the claim was (1) solely the fault of a Gooding's employee; (2) unintentional on Access's behalf; and (3) occurred despite Access's policies and procedures to avoid any such errors.

### A. Any "Error" Was The Responsibility Of Gooding's

Gooding's admits that the "error" in programming its ATM was the result of a programming error by the Gooding's bookkeeper in charge of the ATM – not the result of any actions taken by Access. CSF ¶ 39. Gooding's also acknowledges that its employee attended training from Access prior to the Gooding's ATM going on-line and that it received from Access accurate fee sticker notices and instructions for programming the proper surcharge fee into the Gooding's ATM. CSF ¶ 22. Notwithstanding this training and receipt of accurate fee notices and programming instructions, a *Gooding's employee's* failure to follow these procedures resulted in the programming error at issue.

### B. Any "Error" On Access's Behalf Was Unintentional

It is undisputed that Access did not intentionally make the programming error – a Gooding's employee unintentionally made the programming error. CSF ¶ 39. Access had no involvement in the error, other than sending to Gooding's the correct fee notice stickers and programming instructions. CSF ¶¶ 30-32. Plaintiff has neither alleged anything differently nor offered any evidence to the contrary.

---

[3]  Although there is only one reported case discussing bona fide error under the EFTA, that provision is substantially similar to the unintentional or bona fide error provision of TILA, a statute that has virtually identical liability provisions as the EFTA. *See* 15 U.S.C. § 1640(c).

The unintentional programming error at issue in this case is precisely the type of errors subject to the *bona fide* error defense. In a TILA case, the Court considered a bona fide error defense. *Gilstrap v. Heights Fin. Corp.*, No. 85-1385, 1986 WL 27587, *2 (C.D. Ill. Aug. 28, 1986). In its analysis, the Court stated that "[e]xamples of a bona fide error include, but are not limited to, clerical, calculation, ***computer malfunction and programming***, and printing errors." *Id.* (emphasis added). In doing so, the Court granted summary judgment to the defendant on the bona fide error issue. *Id.* at *3. *See also Henning v. Daniels*, 653 F.2d 104 (4th Cir. 1981) (finding unintentional error under TILA where defendants uncontroverted testimony was that the omission was an oversight); *Bailey v. Defenbaugh & Co. of Cleveland, Inc.*, 513 F. Supp. 232 (N.D. Miss. 1981) (finding unintentional error under TILA where defendant did not deliberately omit signature). The programming error in this case is precisely the sort of *bona fide* error for which the statute creates a defense.

### C.   Access Maintains Policies And Procedures To Avoid Such Errors

At all times relevant to this proceeding, Access maintained policies and procedures designed to ensure that merchant-owned ATMs disclosed proper fee notices both by sticker and in electronic format. This evidence is undisputed. CSF ¶¶ 16-23.

Access regularly conducts training courses for merchants operating ATMs on the Access network. CSF ¶ 22. This course includes training on surcharge disclosure information. Gooding's acknowledges that its employee attended this training course and, in fact, received training regarding surcharge disclosures. CSF ¶ 22.

Additionally, Access's procedures dictate that its customer service representatives log all communications with merchants. CSF ¶ 17. The procedures also require the customer service representatives to log all materials sent to the merchants, including the fee notice stickers and programming instructions for the merchants' ATMs. CSF ¶¶ 17-20. Access business

records and Gooding's itself acknowledge that Access followed these procedures to the letter. CSF ¶¶ 30-32. In fact, Gooding's even acknowledges that its employee attended a training session on ATMs held by Access. CSF ¶ 22.

Access business records indicate that on April 3, 2001, Carol of Gooding's called Access and requested that Access change the surcharge fee on the Gooding's ATM from $1.50 to $2.00. CSF ¶ 30. This call was logged contemporaneously into an Access computer database. CSF ¶ 30. On April 4, Access followed its procedures and sent to Gooding's accurate fee notice stickers for the Gooding's ATM together with instructions for programming the electronic screen on the Gooding's ATM. CSF ¶ 31.

On April 8, 2004, Gooding's again called Access and requested that Access fax Gooding's the instructions for reprogramming the Gooding's ATM. CSF ¶ 32. This communication was again logged into the Access database. CSF ¶ 38. And again, Access followed its procedures and faxed the instructions to Gooding's that same day. CSF ¶ 38.

Notwithstanding that Access maintained and followed these procedures, the Gooding's employee failed to program the ATM correctly. Access had no way to discover or correct this error, as it does not exercise daily control over the Gooding's ATM.

## **CONCLUSION**

For the foregoing reasons, Plaintiff is not entitled to summary judgment in this action. To the contrary, the undisputed record facts show that summary judgment should be granted to Access because (1) it is not the "operator" of the Gooding's ATM under the EFTA and (2) even if it were the operator, Plaintiff is precluded from recovery by the EFTA's bona fide error defense.

Dated: July 26, 2004                                    Respectfully submitted,

                                                        s/ John F. Henault
Robert M. Brochin                                       Douglas P. Lobel (*pro hac vice*)
Florida Bar No. 0319661                                 David A. Vogel (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP                             John F. Henault (*pro hac vice*)
5300 Wachovia Financial Center                          ARNOLD & PORTER LLP
200 South Biscayne Boulevard                            1600 Tysons Boulevard
Miami, Florida 33131-2339                               Suite 900
Telephone:   305.415.3456                               McLean, Virginia 22102
Facsimile:   305.415.3001                               Telephone:   703.720.7000
                                                        Facsimile:   703.720.7399

Counsel for Defendant E*TRADE Access, Inc.

- 20 -

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2004, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Brian G. Pincket, Lance Rafael and T. Todd Pittenger.

s/ John F. Henault
John F. Henault
ARNOLD & PORTER LLP
1600 Tysons Boulevard
Suite 900
McLean, Virginia 22102
Telephone:   703.720.7000
Facsimile:    703.720.7399
john_henault@aporter.com

Counsel for Defendant E*TRADE Access, Inc.