FILED

UNITED STATES DISTRICT COURT JUL 27  AM 10: 39
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION   CLERK U.S. DISTRICT COURT
                   MIDDLE DISTRICT FLORIDA
                   ORLANDO, FLORIDA

GILBERT POLO, individually
and on behalf of all
others similarly situated,

        Plaintiff,                Case No.: 6:03-CV-134-ORL-28 JGG

v.

GOODING'S SUPERMARKETS,
INC., a Florida corporation, E*TRADE
BANK, a federal savings bank, E*TRADE
ACCESS, INC.,

        Defendants.
_____/

**PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS GOODING'S
SUPERMARKETS, INC.'s AND E*TRADE ACCESS, INC.'S MOTIONS FOR
SUMMARY JUDGMENT**

**I.    Introduction**

The E*Trade ATM located in the Lake Buena Vista Gooding's Supermarket was

overcharging customers for more than sixteen months.  Despite the over sixteen-month

period during which the Defendants systematically avoided compliance with the

Electronic Fund Transfers Act, 15 U.S.C. § 1693 *et seq.*, ("EFTA"), they claim that this

Court should find their error to be a bona fide one.  It defies logic for the Defendants to

argue a bona fide error defense under these circumstances – had any maintenance and

training procedures been in place to avoid the more than 7,127 <u>admitted</u> disclosure violations,[1] the Defendants certainly would have noticed the violation and corrected it.

Throughout their Memoranda of Law in support of their motions for summary judgment, Defendants cite to what they describe as the procedures they maintained that were reasonably adopted to avoid the over 7,000 EFTA violations that are the subject of this action. A careful review of those "procedures" reveals that not one of them operates as a mechanism to check or recheck the programming of the ATM that is the subject of this action. Defendants simply cite to the procedures they used to program the ATM. As the cases cited herein make abundantly clear, the EFTA requires more than this from an ATM operator when it transacts with consumers. The EFTA requires that one actually anticipate the errors that can occur and design "a safety check or a rechecking mechanism" to prevent those errors.[2]

## II.    Statement of Material Facts[3]

Plaintiff Gilbert Polo and Defendants Gooding's and E*Trade agree that the following facts are undisputed:

---

[1]    Gooding's admits that there were 7,127 ATM transaction fees, between February 3, 2002 and August 5, 2002, in which the ATM terminal screen improperly notified the user that the fee would be $1.50 when it was actually $2.00. But the Gooding's ATM was operating with the incorrect screen notification from April 3, 2001 to August 5, 2002, meaning that there were more than 7,000 independent violations of the EFTA. In fact, 27,578 fees were imposed from April 2001 to September 2003. *See* Gooding's Response to Plaintiff's First Set of Interrogatories at No. 4 (attached as Ex. 5 to Plaintiff's Motion for Summary Judgment).

[2]    *Gallegos v. Big "A" Auto Parts*, 593 F.2d 372, 376 (10th Cir. 1979).

[3]    Plaintiff fully incorporates herein by reference all undisputed facts listed in his motion for summary judgment, filed on July 2, 2004.

(1)     Polo used an ATM located at 1251 S.R. 535, Lake Buena Vista, Florida (the "subject ATM"), to withdraw money on July 5, 2002.[4]

(2)     From April 3, 2001 to August 5, 2002, the subject ATM had a computer notification screen that disclosed a $1.50 surcharge fee.[5]

(3)     From April 3, 2001 to August 5, 2002, the subject ATM asked consumers to agree to a $1.50 surcharge fee for transactions, using the following language:

FEE NOTICE U.S. CARDHOLDERS

The owner of this terminal will deduct $1.50 from your account as its fee from you for the transaction you have chosen. This fee is in addition to any fee your financial institution may charge.

Cancel transaction – pay no fee                    I agree to fee – continue[6]

(4)     In fact, from April 3, 2001 to August 5, 2002, the subject ATM charged consumers a $2.00 surcharge fee for transactions.[7]

(5)     On July 5, 2002, Polo agreed to pay a $1.50 fee but was charged a $2.00 fee, as reflected on the printed receipt he received after completing his transaction.[8]

The five numbered paragraphs above, along with the facts presented in Plaintiff's motion for summary judgment, demonstrate that judgment must be rendered in Plaintiff's favor for Defendants' violation of 15 U.S.C. § 1693b(d)(3) and 12 CFR § 295.16. Defendants do not dispute that a violation of the EFTA occurred. Instead, they argue that

---

[4]     *See* ¶ 2 of Polo Affidavit (attached as Ex. 1 to Plaintiff's Motion for Summary Judgment) and ¶ 8 of Gooding's First Amended Answer.

[5]     *See* ¶ 5 of Polo Affidavit and ¶ 14 of Gooding's First Amended Answer.

[6]     *See* pg. 7 of Gooding's Memorandum.

[7]     *See* ¶¶ 8, 9 of Polo Affidavit and ¶ 17 of Gooding's First Amended Answer.

[8]     *See id.*

the EFTA violation was the result of a bona fide error.  Because it is the Defendants'

burden to plead and prove a bona fide error affirmative defense, Defendants must present

sufficient undisputed material facts to avoid liability for their violation.  They do not.

The following underlined fact, all material to the bona fide error defense,

prevent entering judgment in Defendants' favor and demonstrate that it is Plaintiff who is

entitled to judgment as a matter of law:

> (1)   Gooding's did not correctly reprogram the subject ATM on April 3,
> 2001.[9]  In fact, while Gooding's admits that the Lake Buena Vista
> Gooding's store went on-line with a $2.00 transaction fee on April 3,
> 2001, E*Trade states that Gooding's requested that the reprogramming
> instructions be re-sent on April 8, 2001.[10]  Moreover, Gooding's admits
> the terminal screen did not reflect the $2.00 fee until August 5, 2002.[11]
>
> (2)   Gooding's did not check the subject ATM on April 3, 2001 after
> completing the "reprogram" to make sure it worked correctly.[12]
>
> (3)   Gooding's did not check the subject ATM for EFTA compliance at any
> time between April 3, 2001 and August 5, 2002.[13]
>
> (4)   An E*Trade representative misrepresented that the exterior terminal fee
> notice and terminal screen notice would be changed on April 3, 2001.[14]

These additional facts mean that neither Defendant can establish the required elements of the

bona fide error defense.

---

[9]    *See* pg. 5 of Gooding's Memorandum.

[10]   *See* pg. 4 of E*Trade's Memorandum.

[11]   *See* ¶ 7 to Supplemental Declaration of Ray Vann.

[12]   Gooding's did not know the terminal screen was displaying the incorrect notice until
August 5, 2002.  *See* ¶ 7 to Supplemental Declaration of Ray Vann.

[13]   *See id.*

[14]   *See* Ex. 4 to Plaintiff's Motion for Summary Judgment, ACS Surcharge Profile.

**A.      The Record Does Not Support Gooding's Bona Fide Error Defense**

The following gaps in the record evidence provided show that Gooding's did not maintain procedures reasonably adapted to avoid EFTA disclosure violations.

(1)      Gooding's provides no credible evidence that, from April 3, 2001 to October 9, 2002, (the date the ATM surcharge was increased to $2.50), the subject ATM had a posted FEE NOTICE disclosing a $2.00 surcharge.  Plaintiff has not stated that he saw any $2.00 FEE NOTICE posted on the outside of the ATM and Gooding's provides a picture of the ATM as it looked on August 2, 2003 – over one year after Plaintiff visited the ATM, well after the instant lawsuit had been filed, and with a $2.50 FEE NOTICE pictured, not a $2.00 FEE NOTICE.[15]

(2)      Gooding's provides no credible evidence that its employees attended an E*Trade training course.  Gooding's states that "prior to the Gooding's Lake Buena Vista Store ATM going on-line on April 3, 2001, Gooding's required its managerial and bookkeeping employees who would be responsible for the ATMs at all Gooding's locations to attend an ATM training course administered by E*Trade."  However: What date did this alleged training occur on?  Where was the training session completed?  Which Gooding's employees attended?  Which E*Trade employee was present for the training?

(3)      Gooding's provides no credible evidence that it adopted the policies and procedures provided by E*Trade and actually completed the required surcharge reprogram.  In fact, the uncontroverted record evidence shows that Gooding's did not accomplish the reprogram until August 5, 2002.[16]

(4)      Gooding's provides no credible evidence to show that it called E*Trade to "make sure that E*Trade received confirmation from its processor of the new surcharge amount."[17]  Who at Gooding's made the call?  When did this call occur?  This statement is also contradicted by E*Trade phone logs which show that Gooding's called on April 8, 2001 "needing to reprogram the

---

[15]      In any event, any posting on the ATM itself is irrelevant.  The statute requires a fee notice on both the screen and the physical machine.  See 15 U.S.C. §1693b(d)(3)(B)(i) and (ii).

[16]      See ¶ 7 to Supplemental Declaration of Ray Vann.

[17]      Gooding's provides no citation to the record for this statement on pg. 5 of its Memorandum, and there is no date, time or record of the phone call discussed in ¶ 6 of the Marcus Supplemental Declaration.

surcharge in the terminal, she hadn't gotten her instructions or stickers yet."[18]
And there is no E*Trade phone log of the alleged call from Gooding's to
"check" the reprogram.[19]

This lack of proof dooms Gooding's bona fide error defense.

**B.   The Record Does Not Support E*Trade's Bona Fide Error Defense or Its
Claim that It is Not an ATM Operator**

While E*Trade also argues that it is not liable for any EFTA violations because
any error was a bona fide one, E*Trade further claims that it is not subject to the Act's
requirements because it is not an operator.   However, the undisputed facts show that
E*Trade is an operator of the subject ATM.

First, any argument that E*Trade does not operate the Gooding's ATM is directly
contradicted by the posting on the ATM itself.   The photographs attached to Ray Vann's
Supplemental Declaration demonstrate that <u>E*Trade</u> is the identified operator of the
ATM.[20]

Second, it is E*Trade that was responsible for verifying when the Gooding's
ATM fee changes would made.   E*Trade Access, Inc.'s representative, Romain Kanege,
affirmed that he understood the surcharge change from $1.50 to $2.00 "will require an
immediate change to the exterior terminal fee notice and fee notice on the terminal
screen," and stated that, "Both of these changes will be made on 04/03/2001."[21]

---

[18]   *See* A000065, attached to Declaration of Teri Friedler.

[19]   *See* ¶ 9 to Declaration of Teri Friedler.

[20]   FEE NOTICE.  The operator of this ATM, E*TRADE Access, Inc., may charge a $2.50
fee to U.S. cardholders for withdrawing cash...

[21]   *See* Ex. 4 to Plaintiff's Motion for Summary Judgment, ACS Surcharge Profile.

Therefore, E*Trade (as an operator of the violative ATM) was responsible for EFTA compliance, and cannot invoke a bona fide error defense when it is undisputed it had no procedures in place to ensure that Gooding's or its own representatives reprogrammed the ATM properly.

## III.    Legal Discussion

Although Defendants' motions for summary judgment go to great lengths to show how their more than 7,127 EFTA violations were somehow unintentional, neither Defendant offers any explanation as to how the subject ATM's computer notification screen disclosed a $1.50 fee yet charged a $2.00 fee. Making matters more difficult is the Defendants' failure to include testimony from the person who allegedly attempted the April 3, 2001 reprogram. Surely, if Defendants had reasonable procedures in place to ensure compliance with the EFTA, the violation would not have gone unnoticed for more than sixteen months.

### A.    The Requirements and Purpose of the EFTA

The Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq*., ("EFTA"), and its implementing regulations, 112 CFR 205.1 *et seq*., ("Regulation E"), prescribe the timing and substance of the fee disclosures ATM operators are required to provide ATM users. Specifically, 12 CFR 205.16(b) and (c), implementing 15 U.S.C. § 1693b(d)(3)(A-D), govern ATM operators as follows:

> *(b)    General. An automated teller machine operator that imposes a fee on a consumer for initiating an electronic fund transfer or a balance inquiry shall:*
>
> > *(1)    Provide notice that a fee will be imposed for providing electronic fund transfer services or a balance inquiry; and*

      *(2)*    **_Disclose the amount of the fee_**.

   *(c)*   *Notice requirement. An automated teller machine operator must comply with the following:*

      *(1)*    *On the machine. Post the notice required by paragraph (b)(l) of this section in a prominent and conspicuous location on or at the automated teller machine; and*

      *(2)*    *Screen or paper notice.* **_Provide the notice required by paragraphs (b)(1) and (b)(2) of this section either by showing it on the screen of the automated teller machine or by providing it on paper, before the consumer is committed to paying a fee_**.[22]

Therefore, no fee may be imposed in connection with a consumer-initiated electronic fund transfer unless: (1) the consumer receives such notice in accordance with the foregoing statutes and regulations; and (2) the consumer elects to continue with the transaction after receiving such notice.    Despite this two-fold statutory notice requirement, Defendants failed to disclose the correct transaction fee to Plaintiff, violating 15 U.S.C. § 1693b(d)(3)(A) – (C).[23]  This gives rise to liability for actual and statutory damages.[24]

### B.    Defendants Cannot Establish That the Incorrect Screen Notification Was a Bona Fide Error

To prevail under a bona fide error theory, it is insufficient to argue that the alleged "error" is unintentional.  Defendants must also show, by a preponderance of the evidence,

---

[22]    Emphasis added.

[23]    Plaintiff incorporates herein by reference Section IV of his memorandum in support of his motion for summary judgment, filed on July 2, 2004.  Section IV details how each element of the EFTA is met in this case.  First, both Defendants were ATM operators.  Second, Defendants imposed a fee for Plaintiff's use of the ATM.  Third, Defendants provided "host transfer services" to Plaintiff.  And fourth, Defendants failed to provide the EFTA-required notice.

[24]    *See* 15 U.S.C. § 1693m.

that the violation resulted from a bona fide error, notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.[25]   Gooding's and E*Trade cannot meet this burden.

### 1.   Neither Defendant had a system in place to supervise and monitor ATM surcharge reprograms

Because of the sparse caselaw interpreting the bona fide error defense in the context of the EFTA, this Court can look to bona fide error cases arising under the Truth in Lending Act.[26]   Those cases explain that the bona fide error defense is available for clerical errors "which occur despite a system for correcting them."[27]   Here, the Defendants have not shown that they maintained any procedures reasonably adopted to avoid error because there was no system to check for errors and correct them.

The bona fide error defense cannot be an after-the-fact rationale for why a statutory violation occurred.   Rather, the defense requires the party trying to take advantage of it to design procedures specifically created to avoid and prevent bona fide errors in the first place.   Good faith in the initial procedure design is not enough – one

---

[25]   *See* 15 U.S.C. § 1693m(c).

[26]   15 U.S.C. § 1601 *et seq*., ("TILA").   The TILA articulates the bona fide error defense in the same terms as the EFTA does.   *See* 15 U.S.C. §1640(c).

[27]   *See, e.g., Jacobson v. Stern's*, No. 78 Civ. 3019, 1985 U.S. Dist. LEXIS 14044 (S.D.N.Y. Nov. 8, 1995)(finding that Defendant established bona fide error where it visited the company issuing its credit cards and consistently monitored it, instituted comprehensive compliance procedures and enforced "triple-checks" of forms, and encountered an extremely low percentage of error).   To the contrary, E*Trade has presented no evidence to show that it visited Gooding's to check compliance or had any mechanism in place to ensure the reprograms were successfully completed.   If it had such a mechanism, the incorrect terminal screen would have been caught before it had been operating incorrectly for more than sixteen months.   And Gooding's has presented no evidence to show it even bothered to check any alleged reprogramming attempts.

actually needs to anticipate errors that can occur and design "a safety check or a rechecking mechanism" for those errors that may slip through the cracks.[28]

For example, if one well-trained clerk performs a particular task and an error is made, to establish a bona fide error defense that clerk must show either: (1) that he has a procedure in place to double-check his work; or (2) that his work has been checked by a second well-trained employee.[29]  Neither Gooding's nor E*Trade present any testimony or evidence that they utilized any "extra preventative step … safety catch or a rechecking mechanism" designed to detect errors.[30]

All E*Trade states is that it mailed Gooding's the posted ATM fee notice and faxed instructions on how to program the machine.[31]  E*Trade did not confirm in any manner that the machine was actually reprogrammed or that the mailed fee notices were received.[32]  E*Trade has absolutely no rechecking mechanism in place.

Likewise, Gooding's cannot even state that it checked its bookkeeper's alleged reprogram of the ATM.  In fact, Gooding's never even looked at the terminal screen to make sure it had been reprogrammed correctly.  It was only after a customer complained, more than sixteen months after the botched "reprogram," that Gooding's even bothered to

---

[28]  *See Gallegos v. Big "A" Auto Parts*, 593 F.2d 372, 376 (10th Cir. 1979), *citing Mirabal v. General Motors Acceptance Corp.*, 537 F.2d 871, 878 (7th Cir. 1976) *rev'd on other ground; Brown v. Marquette Savings & Loan*, 686 F.2d 608 (7th Cir. 1982).

[29]  *See Davison v. Bank One Home Loan Services*, 2003 U.S. Dist. LEXIS 514, *27 (D. Kan. Jan. 13, 2003); *In re: Webster v. Centex Home Equity Corp.*, 300 B.R. 787, 798 (W.D. Ok. 2003).

[30]  *In re: Webster*, 300 B.R. at 799.

[31]  *See* Declaration of Teri Friedler at ¶¶ 9-11.

[32]  *See* pg. 8, 9 of E*Trade's Memorandum.

check the screen of the machine.[33] It strains credulity to think that for a period of over sixteen months, no one at Gooding's used or even looked at the ATM located within its own store.

This requirement – that a defendant demonstrate by a preponderance of the evidence that the error occurred, notwithstanding the maintenance of reasonable procedures reasonably adapted to avoid any such error – is to be construed strictly.[34] Courts require:

> [T]hat a special system be established to assure that no initial errors occur, and that a checking mechanism be maintained to catch any errors that slip through the system.[35]

One court in particular, while agreeing that an error was bona fide, considered that the defense "requires a defendant to do more than simply maintain proper procedures – it also requires back up to detect and eliminate possible errors which occur while attempting good faith compliance."[36] The *Gilstrap* court went on to explain that "use of a computer seconded by careful, two-time human review…could entitle Defendant to the use of the bona fide error defense."[37]

Without any mechanism for catching initial errors and then checking ATM reprograms, it is clear that Defendants did not have any procedures in place to monitor

---

[33]     *See* pg. 3 of Gooding's Memorandum.

[34]     *See Thomka v. A.Z. Chevrolet, Inc.*, 619 F.2d 246, 251 (3d Cir. 1980).

[35]     *Id., citing Gallegos*, 593 F.2d at 376, *Mirabal*, 537 F.2d at 876-79, *Turner v. Firestone Tire & Rubber Co.*, 537 F.2d 1296, 1297-98 (5th Cir. 1979).

[36]     *Gilstrap v. Heights Finance Corp.*, No. 85-1385, 1986 U.S. Dist. LEXIS 21043, *7 (C.D. Ill. Aug. 28, 1986).

[37]     *Id.*

compliance with the EFTA notice requirements. They cannot therefore establish the "maintenance of reasonable procedures" prong of the bona fide error defense.

> **2.    This was not an isolated occurrence, but a violation that happened over and over again**

In trying to establish bona fide error, the Defendants rely on caselaw where courts excused statutory noncompliance in isolated circumstances, not thousands of instances. Here, Defendants are asking this Court to excuse more than 7,127 independent violations of the EFTA.

One of the factors considered in determining whether to accept a bona fide error defense is the number of violations that occurred. Both Defendants rely upon *Bailey v. Defenbaugh & Co.*[38] to support their claim that the EFTA violations occurred as a result of a bona fide error. But the *Bailey* court ruled that defendant was entitled to invoke the defense after reviewing a three-tiered oversight system and recognizing, "[t]hat defendant has violated lending laws so few times is also indicative of a "clerical" error. Presumably, widespread, systematic errors would have resulted in numerous violations of the law."[39] Plaintiff has presented uncontroverted evidence of widespread, systematic errors at the subject ATM.[40]

---

[38]    513 F. Supp. 232 (N.D. Miss. 1981).

[39]    *Id.* at 238.

[40]    Gooding's admits that, from the moment the ATM went on-line on April 3, 2001 until August 5, 2002, the ATM disclosed a transaction fee on its screen of $1.50 and charged every consumer who used the ATM during that time a transaction fee of $0.50 more. *See* Gooding's Response to Plaintiff's First Set of Interrogatories at No. 4 (attached as Ex. 5 to Plaintiff's Motion for Summary Judgment). *See also* ¶ 7 to Supplemental Declaration of Ray Vann.

Gooding's also refers the Court to another case where a bona fide error was found because the violation was not widespread. In *Doubet v. USA Financial Services, Inc.*, the defendant's initial review <u>and</u> a double check of the first review satisfied the bona fide error requirements because again, the number of violations was considered.[41]

> However, the Court believes it is appropriate to note that the Defendant should not expect to rely upon this "slipped carbon" Defense *ad infinitum*, because at some point in time they should Restructure their review procedures...[42]

The other cases Gooding's cites, including *Marshall v. Security State Bank*,[43] *Henning v. Daniels*,[44] *Washington Motor Sales v. Olwviole Ferreira*,[45] and *Chittester v. LC-DC-F Employees*,[46] all dealt with apparently isolated incidents of noncompliance. These situations are very unlike the present case, where thousands of EFTA violations systematically occurred over an extended period of time. And in cases like *Smith v. Chapman*, where TILA violations appeared on 374 consumer credit contracts in one year – making the noncompliance incidents anything but isolated – courts have not found bona

---

[41]    *See Doubet v. USA Financial Services, Inc.*, 714 F. Supp. 980, 983 (C.D. Ill. 1987).

[42]    *Id.*

[43]    121 B.R. 814 (C.D. Ill. 1990)(defendant bank failed to list all items in which it retained a security interest on <u>one</u> particular automobile financing transaction and court goes on to deny summary judgment on the bona fide error issue).

[44]    653 F.2d 104 (4th Cir. 1981)(defendant forgot to check appropriate insurance box on <u>one</u> security agreement).

[45]    131 N.J. Super. 328 (D. N.J. 1974)(salesman inadvertently forgot to date a signature on <u>one</u> credit life insurance authorization).

[46]    384 F. Supp. 473 (W.D. Pa. 1974)(<u>one</u> plaintiff testifies she was not given a copy of a disclosure form to retain for her own records).

fide error.[47]  Under these circumstances, the *Smith* court wrote:  "It is inconceivable that

Defendant could make a colorable argument in favor of bona fide error in light of the

same violations appearing on each retail installment contract."[48]

> ### 3.  Summary judgment may still be entered in Plaintiff's favor because there is insufficient evidence of a bona fide error

Courts have granted summary judgment for plaintiff consumers even in cases

where a defendant has tried to raise the bona fide error defense.  If the defendant cannot

meet the required evidence standard, judgment for the plaintiff is appropriate.[49]

Here, the Defendants not only failed to implement a system for checking the

accuracy of an ATM fee reprogram, but also allowed its violations to go unchecked for

more than sixteen months.  In light of these failings, Gooding's and E*Trade should not

be granted judgment on any alleged bona fide error.  For all of the reasons stated in

Plaintiff's memorandum in support of his own motion for summary judgment, judgment

should be entered for Plaintiff as a matter of law.

### C.  E*Trade Was an Automated Teller Machine Operator

As noted in the facts section above, while E*Trade contests that it was an operator

of the ATM when Plaintiff used it, the evidence dictates otherwise.  Defendants claim

---

[47]   *Smith v. Chapman*, 436 F.Supp. 58, 65 (W.D. Tx. 1977), *judgment aff'd, Smith v. Chapman*, 614 F.2d 968 (5th Cir. 1980)("All of the violations of the Truth in Lending Act and the Credit Code detailed above are violations which appeared in every one of the three hundred and seventy-four (374) retail installment contracts executed by Defendant in 1974.")

[48]   *Id.*

[49]   *See, e.g., Smith v. Chapman*, 436 F.Supp. 58 (W.D.Tx. 1977), *judgment aff'd, Smith v. Chapman*, 614 F.2d 968 (5th Cir. 1980); *Abel v. Knickerbocker Realty Co.*, 846 F.Supp. 445 (D. Md. 1994); *Aldrich v. Upstate Auto Wholesale of Ithaca, Inc.*, 564 F.Supp. 390 (N.D.N.Y. 1982); *Sambolin v. Klein Sales Co.*, 422 F.Supp. 625 (S.D.N.Y. 1976).

that on July 5, 2002, the date Plaintiff used the ATM, the ATM contained a notice that read, in relevant part: "The operator of this ATM, E*Trade Access, Inc. . . ." (Emphasis added.)[50]   There is no evidence put forth by E*Trade that such notice was put on the ATM without its permission or authority, or that E*Trade was not aware of the existence of such notice.

In addition, E*Trade referred to itself as the "operator" of a nationwide network of ATMs in the Form 10-Ks it filed with the United States Securities and Exchange Commission for fiscal years ending December 31, 2001 and 2002.   E*Trade also apparently accepted the responsibility to ensure that the screen notice on the ATM complied with EFTA.[51]

Moreover, E*Trade and Gooding's "E*TRADE ATM SITE LOCATION AGREEMENT," dated March 21, 2001, provides that E*Trade will dictate and/or control the following aspects of the operation of the ATM:[52]

(1)     The location of the ATM in the Gooding's store (paragraph 1);

(2)     The right to schedule downtime to accomplish necessary maintenance or system improvements (paragraph 2);

(3)     The collection of all transaction revenue from the ATM, the payment to Gooding's of a transaction fee for each transaction, and the right to increase or decrease the amount of the payments to Gooding's (paragraph 3);

---

[50]     *See* G000067, attached to Supplemental Declaration of Anthony Marcus.

[51]     *See* Ex. 4 to Plaintiff's Motion for Summary Judgment, ACS Surcharge Profile.   This task, of course, was not done.

[52]     It is this Site Agreement which allows E*Trade to derive a financial benefit from the ATM's operation.   A copy of the Site Agreement is attached to Exhibit 2 (the Marcus declaration) to Gooding's Opposition to Plaintiff's Motion for Class Certification.

(4)     The ability of Gooding's to impose a transaction fee based on E*Trade's processor/network rules, the right to increase or decrease the portion of the transaction fee surcharge payable to Gooding's, and requiring Gooding's to comply with all posting, consumer notification and other requirements <u>imposed by network rules</u> (paragraph 4);

(5)     E*Trade provides parts, maintenance and repair services for the ATM, the right to withhold transaction fees if E*Trade-provided services are not timely paid for, prohibits Gooding's from using another company to perform any service or repair work on the ATM without E*Trade's prior written approval, requires notification by Gooding's to E*Trade within 24 hours of any ATM failure, damage or other problem, and gives E*Trade's the right to enter upon the Gooding's premises to inspect, repair, maintain or upgrade the ATM and to observe its use (paragraph 5);

(6)     Requires Gooding's to use the company of E*Trade's choice for data processing services (paragraph 6);

(7)     Prohibits Gooding's from placing any other brand name on the ATM without E*Trade's prior written consent, provides E*Trade with the exclusive right to advertise on the on the front, back, top and side panels on the ATM, the ATM receipt paper, all video monitors and audio devices on the ATM, and all other ATM surfaces, and requires Gooding's to permit E*Trade advertising campaigns on the ATM (paragraph 7); and

(8)     Prohibits Gooding's from removing the ATM, placing any other automated teller machine on the Gooding's premises, or subscribing to any other service for processing ATM transactions (paragraph 10).

These facts necessitate a finding by this Court that E*Trade was an operator of the ATM on July 5, 2002.

Finally, in their memoranda of law in support of their motions for summary judgment, and in support of their bona fide error defenses, each Defendant "points the finger" at the other in an attempt to shift the responsibility for compliance with EFTA away from itself. The EFTA does not permit an ATM operator to relieve itself of its legal obligations to comply with the Act's disclosure requirements by agreement with another party. As between Goodings and E*Trade, the Site Location Agreement may put the responsibility for compliance with the EFTA on one party, but an ATM operator

cannot contract away its legal obligations under the EFTA to disclose the surcharge on the screen of the ATM.

**IV.    Conclusion**

Defendants' motions for summary judgment must be denied in their entirety. Gooding's and E*Trade both fail to show that their multiple EFTA violations resulted from some bona fide error, notwithstanding the maintenance of procedures reasonably adapted to avoid any such error. E*Trade's efforts to disclaim its "operator" status are similarly unavailing. Accordingly, for the reasons stated above, and for all other reasons stated in Plaintiff's own motion for summary judgment and supporting memorandum, this Court should grant judgment as a matter of law in Plaintiff's favor.

Respectfully submitted,

Brian G. Pincket , Esq.
Florida Bar No.: 501425
MILAM HOWARD NICANDRI
DEES & GILLAM, P.A.
50 N. Laura Street, Suite 2900
Jacksonville, Florida 32202
Telephone: (904) 357-3660
Facsimile: (904) 357-3661

Lance A. Raphael, Esq.
Stacy Bardo, Esq.
The Consumer Advocacy Center, P.C.
180 West Washington, Suite 700
Chicago, IL 60602
Telephone: (312) 782-5808
Facsimile: (312) 377-9930

Attorneys for Plaintiff