# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**GILBERT POLO,**                                    **NO: 6:03-CV-134-ORL-28 JGG**

       **Plaintiff,**

**v.**

**GOODING'S SUPERMARKETS, INC., and**
**E\*TRADE ACCESS, INC.,**

       **Defendants.**

_____/

## TRIAL BRIEF OF DEFENDANT E\*TRADE ACCESS, INC.

## INTRODUCTION

After multiple unsuccessful attempts to certify this case as a class action, all that is left is an alleged 50 cent overcharge on the transaction surcharge fee at one automated teller machine ("ATM"). Although Plaintiff Gilbert Polo ("Polo") claims significant damage from being required to pay $2.00 for his ATM transaction, both signs on the ATM confirmed that the fee would be exactly $2.00. Only after reviewing and bypassing both signs did Polo proceed to withdraw cash from the machine. He challenges the $2.00 charge in light of a third posting on the ATM screen stating that the fee would be $1.50.

Trial will show that:

- Polo cannot prove the reliance required under the Electronic Fund Transfers Act, 15 U.S.C. § 1693, *et seq.* ("EFTA"), and its related Regulation E, 12 C.F.R. § 205, *et seq.*;

- Access does not meet the statutory definition of a party liable for an ATM overcharge; and

- Access falls within an express exclusion from liability, the *bona fide* error defense.

## BACKGROUND

### I.   POLO'S CLAIM

Polo alleges that he was overcharged 50 cents when he used an ATM at the Gooding's Supermarket in Lake Buena Vista, Florida. An ATM is a computerized device connected to a network of banks and financial institutions. For a small fee, an ATM dispenses cash to a customer and then deducts that amount from the customer's bank account. Polo claims that an electronic notice at the Gooding's ATM stated that he would be charged a transaction fee of $1.50, but that the actual transaction fee assessed was $2.00. Polo now invokes federal subject matter jurisdiction and demands a civil jury trial to recover his 50 cents.

As his sole cause of action, Polo alleges a violation of the EFTA. The alleged violation pertains to the EFTA's provision stating that an "automated teller machine operator" may impose a transaction surcharge fee only if the fee has been properly noticed and only if the consumer accepts the fee. *See* 15 U.S.C. § 1693b(d)(3)(C). Civil liability attaches for violations of this section. *See* 15 U.S.C. § 1693m. Pursuant to a statutory formula, Polo's total possible damages are between $100.50 and $1002.00. Polo also claims that he is entitled to attorney's fees exceeding $140,000.00.

The facts relating to Polo's claim are simple: On or about July 5, 2002, Polo used an ATM machine at the Gooding's Supermarket. The ATM displayed two signs, posted on the outside of the machine, that the ATM's transaction surcharge fee would be $2.00. Consistent with these notices, Polo was charged $2.00 for his ATM transaction. The sole factual basis for Polo's complaint is that there was a third notice, displayed electronically on the ATM screen, stating that the transaction surcharge fee would be $1.50. Polo would have received this electronic notice only after he attempted to access the ATM where the $2.00 notices were posted.

## II.    ACCESS'S DEFENSES

Access will defend this case on three grounds: *First*, Polo must demonstrate under the EFTA that he individually relied on the erroneous electronic fee notice while conducting his ATM transaction.  Polo cannot prove this element because two signs posted on the ATM accurately informed him that the transaction surcharge fee would be $2.00.  *Second*, Access is not an "ATM operator" under the EFTA.  Access neither owned nor operated the ATM at issue, which means that Access was not responsible for posting the ATM fee notices or ensuring that such notices were accurate.  *Third*, even if Access is liable for the transaction surcharge fee error, Polo cannot recover due to the EFTA's "*bona fide* error" exclusion from liability.  The error was unintentional, and occurred despite Access's safeguards for preventing such an event.

To prove a claim under the EFTA, a plaintiff must show that he individually relied on an erroneous fee posting when conducting an ATM transaction.  Here, two out of the three fee notices were accurate.  The two signs on the outside of the Gooding's ATM (which Polo would have seen initially) stated that the transaction surcharge fee was $2.00.  Only after approaching the ATM and inserting his ATM card could Polo have possibly seen the erroneous $1.50 electronic posting.  In other words, Polo was initially informed of the $2.00 transaction surcharge fee, and still elected to conduct the ATM transaction.  Accordingly, Polo did not rely on incorrect fee information when he performed his transaction.

Moreover, the EFTA imposes an obligation on ATM operators to ensure that transaction surcharge fee notices are accurate.  This excludes Access from liability.  Access is a company that provides electronic data processing services for ATMs -- that is, Access merely provides the electronic hookup between the Gooding's ATM and banks, so that customers may

access their accounts from this remote location. Access is not the ATM operator. Providing electronic data processing does not obligate Access to set transaction surcharge fees or program ATMs to display transaction surcharge fees. Consistent with this view, Defendant Gooding's Supermarkets, Inc. ("Gooding's"), has admitted that the 50 cent overcharge resulted from the inadvertent failure of its *own* employee to reprogram its ATM.

Finally, Access is shielded from liability under the EFTA's "*bona fide* error" provision. This provision states that no party is liable under that statute if it proves, by a preponderance of the evidence, that the violation was unintentional and resulted from a *bona fide* error, despite procedures reasonably adapted to avoid such an error. *See* 15 U.S.C. § 1693m(c). Uncontroverted evidence shows that neither Gooding's nor Access intended any programming error. Access further had implemented procedures to ensure that ATM operators program their machines to show the correct fee. Accordingly, Access is simply not liable.

## III.   PRIOR PROCEEDINGS AND ORDERS

On February 26, 2003, Polo filed an Amended Complaint under the EFTA, alleging a single cause of action and seeking certification of a nationwide class. This putative class would consist of all persons overcharged at any ATM for which Access provides electronic data processing services. On February 5, 2004, Magistrate Judge Glazebrook recommended the denial of nationwide class certification because, among other reasons, there were hundreds of possible factual variations that preclude treating all ATM users as a unified group. On March 16, 2004, this Court adopted the Magistrate Judge's recommendation in its entirety and declined to certify the class.[1]

---

[1] On April 9, 2003, Access filed a motion to dismiss the Amended Complaint. The reason was Polo's failure to exhaust available statutory procedures for resolving ATM fee charge errors. This Court denied Access's motion on July 9, 2003, without prejudice to raise the same issues in a motion for summary judgment. On July 25, 2003, Access answered the Amended Complaint and denied all liability.

On June 2, 2004, Polo filed a renewed motion for class certification, this time seeking certification of a smaller class of all Gooding's ATM users during the period in which the electronic notice was incorrect. The Magistrate Judge denied this motion on September 15, 2004. This Court's adoption of the Magistrate Judge's recommendation is pending.

On July 1, 2004, Polo filed a motion for summary judgment, and the next day, Access filed its own motion for summary judgment. Access argued that the EFTA imposes no liability because it is not an ATM operator, but even so, Access is entitled to the *bona fide* error exclusion from liability. These motions remain pending.

## IV. PROPOSED FINDINGS OF FACTS

### A. Individual Reliance

1. On or About July 28, 2002, Polo used the ATM located at the Gooding's Supermarket.

2. At the time of Polo's transaction, the Gooding's ATM displayed two fee notice stickers stating that the transaction surcharge fee was $2.00.

3. These fee notice stickers were posted on the outside of the ATM machine and were clearly visible to all who approached it.

4. Having been notified of the $2.00 fee, Polo nevertheless inserted his ATM card into the machine to conduct a banking transaction.

5. Once he started to proceed through the electronic prompts on the ATM, Polo received a third transaction surcharge fee notice.

6. This third notice -- which appeared on the ATM's computer screen -- stated that the transaction surcharge fee would be $1.50.

7. This fee noticed also provided Polo with the option to either proceed with the transaction or cancel it, if the posted fees were unacceptable to him.

8. Although the ATM provided Polo with the chance to cancel his transaction and avoid the fee, Polo decided to complete his transaction and withdraw his funds.

9. Polo relied on the two accurate ATM fee notices posted on the machine itself, not the one erroneous notice that appeared on the electronic screen.

10. Polo received a receipt from the ATM stating that his transaction surcharge fee was $2.00.

**B.     ATM Network**

11. Access is a company that provides data processing services to ATMs that are part of its nationwide network.

12. For each customer transaction on an ATM, the terminal sends electronic data about the transaction through telephone lines to a processor, which routes the information to the Access network and the customer's bank.

13. For the majority of the ATMs in the Access network, the only relationship between Access and these ATMs is a contract between Access and the ATM owner for Access's electronic data processing services.

14. As established in Access's standard contract with each merchant that owns an ATM, the merchant has full and exclusive control over the ATM. For example:

- The merchant must own or lease the actual real property where the ATM is located.

- The merchant is responsible for keeping the space around the ATM in a safe, neat, and orderly condition, for assuring unobstructed access to the ATM, and for maintaining security at the ATM location.

- The merchant must either buy or lease the ATM equipment.

- The merchant is responsible for filling the ATMs regularly with a sufficient amount of cash to dispense.

- The cash in the ATM is the property and responsibility of the merchant.

- The merchant is required to keep an adequate supply of paper in the ATM for receipts and for balance inquiries.

- The merchant is responsible for providing proper insurance against loss, damage, theft, or destruction of the ATM.

15. If a merchant owns and operates an ATM, then it is the merchant, not Access, who chooses whether to charge a transaction surcharge fee.

16. Furthermore, if the merchant chooses to impose a fee, then the merchant has discretion as to its amount, and the EFTA then controls the merchant's fee disclosure obligations.

17. Access's sole involvement in assessing the transaction surcharge fee is limited to mailing the merchant both a posted notice (a sticker) and instructions on how to program the electronic notice into the ATM.

18. Absent a lawsuit such as this, Access has no way to receive information about whether a merchant has failed to post a sticker notice or program an electronic notice about the ATM fee.

19. The entire responsibility for complying with the EFTA lies with the merchant who owns and operates the ATM.

20. As is typical for ATMs in its network, Access does not own or operate the Gooding's ATM in Lake Buena Vista, Florida.

21. Gooding's is the sole owner and operator of that ATM, a fact confirmed by the terms of the contract between Access and Gooding's.

22. Effective March 15, 2001, Access and Gooding's entered into a Site Location Agreement ("SLA") to connect the specific ATM involved in this case with the Access electronic network.

23. Under the SLA, the relative rights and responsibilities of the parties are set forth, and confirm that Gooding's, not Access, was the operator of the ATM at issue.

24. Under the express terms of this SLA, Gooding's maintains full daily control over the ATM, including:

- Gooding's is responsible for setting the amount of the transaction surcharge fee charged by its ATM. (SLA ¶ 4).

- Gooding's is responsible for complying with all posting, consumer notification, and other requirements imposed by applicable law or network rules. (SLA ¶ 4).

- Gooding's is responsible for owning or leasing the actual property on which its ATM sits. (SLA ¶ 12).

- Gooding's is responsible for keeping the space around its ATM in a safe, neat, and orderly condition. (SLA ¶ 5).

- Gooding's is responsible for ensuring that there is unobstructed access to its ATM. (SLA ¶ 5).

- Gooding's is responsible for buying or leasing its ATM. (SLA ¶ 1).

- Gooding's is responsible for connecting its ATM to telephone and electric lines at its expense. (SLA ¶ 9).

- Gooding's is responsible for filling its ATM with a sufficient amount of cash to dispense. (SLA ¶ 8).

- Gooding's is responsible for keeping an adequate supply of paper in the ATM for receipts and balance inquiries. (SLA ¶ 8).

- Gooding's is responsible for providing insurance against loss, damage, theft, or destruction of its ATM. (SLA ¶ 11).

25. As to the transaction surcharge fee, Paragraph 4 of the SLA confirms that

Gooding's has the sole discretion to determine whether a fee will be charged to ATM users and

to set the amount of the fee:

> 4. Transaction Surcharges. Location [Gooding's] may
> impose a transaction surcharge fee upon ATM transactions
> . . . . Location may establish the initial surcharge amount
> . . . and may increase or decrease the surcharge fee in its
> sole discretion.

26. The SLA also imposes on Gooding's the obligation to comply with the

posting and electronic notice requirements of the EFTA by accurately posting notice of the fee

charge:

> 4. Transaction Surcharges. . . . Location [Gooding's] shall comply
> with all posting, consumer notification and other requirements
> imposed by applicable law or network rules.

## C.    Access's Policies

27. Access maintained policies and procedures to ensure that merchants received

appropriate notices and programming instructions for their ATMs.

28. In this connection, Access employed customer relation representatives to

work with the merchants.

29. Standard practice for these individuals was to log all communications and

correspondence between the merchants and Access.

30. Whenever Access customer relation representatives communicated with a

merchant, they typed contemporaneous notes into a computer about the substance of the

communication.

31. Contemporaneous notes were also logged concerning any actions taken by

Access regarding the merchant's account.

32. Access maintains records of all such notes in the normal and regular course of business.

33. In addition to logging communications, when a merchant contacts Access to change an ATM transaction surcharge fee, customer relation representatives send notices to the merchant.

34. Specifically, customer relation representatives print and send to the merchant new fee-notice stickers with detailed explanations about how to affix the stickers prominently on the ATM.

35. At the same time, customer relation representatives also send instructions about how to reprogram the ATM to create accurate electronic fee notices.

36. These procedures, policies, and requirements ensure that transaction surcharge fee stickers and programming instructions are promptly sent to merchants that own and operate ATMs.

37. In addition to these procedures designed to ensure that merchants receive the proper fee notice stickers and programming instructions, Access administers ATM training courses.

38. These courses include instruction on the need to accurately disclose the ATM transaction surcharge fee on the outside of the ATM, and to accurately disclose the fee on a computer screen that appears before an ATM customer elects to proceed with a transaction.

39. Access also provides merchants with New Customer Service Kits and a Single Cassette Cash Dispenser Operation Manual, which contain instructions for programming the on-screen fee disclosure.

40. Access complied with these procedures in regard to the Gooding's ATM at issue when Gooding's decided to increase its ATM surcharge fee.

41. On April 3, 2001, an individual named Carol from Gooding's called Access and requested that Access change the transaction surcharge fee on the Gooding's ATM from $1.50 to $2.00.

42. Consistent with Access's business practices, this call was logged contemporaneously into an Access computer database.

43. On April 4, 2001, consistent with Access's policies and procedures, Access sent Gooding's new stickers announcing the $2.00 fee and instructions for reprogramming a $2.00 fee notice into the ATM.

44. On April 8, 2001, Gooding's again called Access and requested that Access fax Gooding's the instructions for reprogramming the Gooding's ATM.

45. Consistent with Access's business practices, Access faxed the instructions to Gooding's later the same day.

46. Gooding's has admitted that the erroneous $1.50 fee notice resulted from the failure of a Gooding's employee to reprogram the ATM at issue.

## V.   PROPOSED CONCLUSIONS OF LAW

### A.   Polo Must Prove Individual Reliance.

1. Under the EFTA, a party can maintain its claim only if damages were sustained "by such consumer as a result of such failure." *See* 15 U.S.C. § 1693m(a)(1).

2. No EFTA case has construed this phrase, but the analogous Truth in Lending Act ("TILA") contains identical language. *See* 15 U.S.C. § 1640(a)(1). *See also Johnson v.*

*West Suburban Bank*, 225 F.3d 366, 379 (3d Cir. 2000) ("We do not believe that Congress would have different intended meanings for identical statutory language contained in similar statutes.").

3. The phrase "as a result of such failure" has been construed under the TILA to require the element of individual reliance on a financing institution's noncompliance.

4. The Eleventh Circuit has held that, to obtain actual damages under TILA, each plaintiff must show actual reliance on the defendant's violation. *See Turner v. Beneficial Corp.*, 242 F.3d 1023, 1028 (11th Cir. 2001) (affirming denial of class certification).

5. Specifically, the court ruled that the statutory language "indicates that [Congress] intended that plaintiffs must demonstrate detrimental reliance" to maintain a TILA claim. *See id.*

6. Every other court to consider the issue has reached the same conclusion.[2]

7. It is anticipated that Polo will assert that the EFTA is a strict liability statute, and that a consumer's actual knowledge is irrelevant to prove an EFTA claim.

8. The lone district court case that Polo has cited for this proposition, *Stewart v. Slaughter*, 165 F.R.D. 696, 699 (M.D. Ga. 1996), did not arise under either the EFTA or the TILA and did not address the pertinent statutory language.

9. Rather, under *Turner* and similar cases, an EFTA plaintiff must show that he or she detrimentally relied on the alleged violation of the statute to maintain any valid claim. *See Turner*, 242 F.3d at 1025.

---

[2] *See Perrone v. General Motors Acceptance Corp.*, 232 F.3d 433, 436-40 (5th Cir. 2000); *Stout v. J.D. Byrider*, 228 F.3d 709, 718 (6th Cir. 2000); *Peters v. Jim Lupient Oldsmobile Co.*, 220 F.3d 915, 917 (8th Cir. 2000); *Bizier v. Globe Fin. Servs., Inc.*, 654 F.2d 1, 4 (1st Cir. 1981); *Perry v. Household Retail Servs., Inc.*, 180 F.R.D. 423, 432-33 (M.D. Ala. 1998); *Barlow v. Evans*, 992 F. Supp. 1299, 1310 (M.D. Ala. 1997); *Wiley v. Earl's Pawn & Jewelry, Inc.*, 950 F. Supp. 1108, 1114-17 (S.D. Ala. 1997); *Adiel v. Chase Fed. Sav. & Loan Ass'n*, 630 F. Supp. 131, 133 (S.D. Fla. 1986), *aff'd* 810 F.2d 1051 (11th Cir. 1987).

**B.    Access Is Not an "ATM Operator."**

10.  Under the EFTA, "any ATM operator who imposes a fee on any consumer" must meet certain notice requirements.  *See* 15 U.S.C. § 1693b(d)(3)(A).

11.  An ATM operator is defined as a "person who operates an automated teller machine at which a consumer initiates an electronic funds transfer or a balance inquiry and that does not hold the account to or from which the transfer is made, or about which an inquiry is made." *See* 12 C.F.R. § 205.16(a).

12.  Federal regulations impose notice requirements on the ATM operator "that imposes a fee on a consumer for initiating an electronic fund transfer or balance inquiry." *See* 12 C.F.R. § 205.16(b).

13.  Because the EFTA does not define "operator," the "ordinary and natural meaning" of the word governs. *See Smith v. United States*, 508 U.S. 223, 228 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning.").

14.  Courts have defined "operate" to require a ***high degree of direct, daily control*** over the thing at issue:

- "to put or keep in operation" or "[t]o conduct the affairs of" or "manage," *Neff v. American Dairy Queen Corp.*, 58 F.3d 1063, 1066 (5th Cir. 1995) (individual franchisee operated individual Dairy Queen stores, not national franchisor corporation);

- "to control or direct the functioning of and to conduct the affairs of," *Emerson v. Thiel College*, 296 F.3d 184, 189 (3d Cir. 2002) (individual defendants did not direct the functioning of university);

- "to put or keep in operation"; "to control or direct the functioning of," *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 322 (D. Mass. 1997) (assistant to president of the university did not exercise "authority, control, or discretion" necessary "to be deemed an 'operator'");

- "control over the operations of the licensee in any day-to-day fashion," *Dahlenberg v. Avis Rent A Car Sys., Inc.*, 92 F. Supp. 2d 1091, 1102-03 (D. Colo. 2000).

15. Access did not have the high degree of direct control over the Gooding's ATM to make it an operator under the EFTA. In fact, the express terms of the contract between Gooding's and Access show that Gooding's is the *sole* operator of the Gooding's ATM.

16. Polo will assert that Access must be the "operator" of the ATM under the EFTA because one of the Gooding's ATM stickers stated that Access "operates" the ATM.

17. But Gooding's will admit that it -- not Access -- is the owner and operator of the ATM. Moreover, the sticker's use of the generic word "operates" is not intended to satisfy the legal definition of "operates" under the EFTA.

18. In fact, the undisputed evidence will be that Access does not have the necessary daily control over the Gooding's ATM to be deemed its "operator" under the EFTA.

19. Polo has also pointed to E*TRADE's filings with the SEC as evidence that it "operates" the Gooding's ATM.

20. However, the SEC filings do *not* mention individual ATMs, such as the one at Gooding's Supermarket. Rather, the SEC filings state that Access operates a *network, not individual ATMs* -- "E*TRADE Access, Inc., which operates a nationwide *network* of over 11,000 ATMs." *See* E*TRADE Group, Inc. Dec. 31, 2001 Form 10-K at pp. 5 & 11 (attached to Plaintiff's Motion for Summary Judgment as Exhibit 2).

21. Accordingly, these SEC filings establish that Access operates a data processing network consisting of ATMs, not that Access is the operator of the Gooding's ATM under the EFTA.

22. In the Access network, Access receives electronic data transmissions through the telephone line from individual ATMs, such as the one at Gooding's.

23. After receiving this electronic data, Access routes the information to the consumer's bank to either accept or deny the consumer's withdrawal.

24. The *only* relationship between Access and the Gooding's ATM is a contract between Access and Gooding's through which Gooding's purchases from Access electronic transaction processing services.

25. The fact that Access provides electronic services through the Access network does not evidence the degree of control necessary to be deemed an operator.

26. The EFTA's implementing regulations state that only an "automated teller machine operator that *imposes a fee on a consumer* for initiating an electronic fund transfer or balance inquiry" is responsible for providing notice that a fee will be charged. *See* 12 C.F.R. § 205.16(b) (emphasis added).

27. As established by the uncontroverted record, Access does not impose any fees on consumers. Rather, Gooding's -- the sole owner and operator of the ATM -- imposed the fee about which Polo now complains.

28. Although Access does collect a fee for its data processing services, that fee is imposed on *Gooding's* for using the Access electronic network, not on the consumer for using the Gooding's ATM.

C.      *Bona Fide* Error

29. The EFTA provides that a party is not responsible for a violation of the EFTA if the violation is the result of a "*bona fide* error:"

> [A] person may not be held liable in any action brought under this
> section for a violation of this subchapter if the person shows by a

> preponderance of the evidence that the violation was not
> intentional and resulted from a bona fide error notwithstanding the
> maintenance of procedures reasonably adapted to avoid any such
> error.

*See* 5 U.S.C. 1693m(c).[3]

30. The proof at trial will show that the programming error resulting in Polo's claim was unintentional, and occurred despite Access's policies and procedures to avoid any such problem.

31. Gooding's has admitted that the "error" in programming its ATM was the fault of a Gooding's bookkeeper in charge of the ATM -- not the result of any actions taken by Access.

32. Furthermore, Gooding's has acknowledged that its employee received training from Access before the Gooding's ATM went on-line, and that Access provided accurate fee sticker notices and instructions for programming the proper transaction surcharge fee into the ATM.

33. Notwithstanding this training and the receipt of accurate fee notices and programming instructions, a Gooding's employee failed to follow these procedures, resulting in the programming error at issue.

34. The unintentional nature of the ATM programming error gives Access the latitude to invoke the EFTA's *bona fide* error defense.

35. A case discussing the *bona fide* error defense in the context of the EFTA is *Feinman v. Bank of Delaware*, 728 F. Supp. 1105 (D. Del. 1990), in which the court found that this defense encompasses unintentional human or computer error that blocked customer access to an ATM account.

36. In a TILA case, *Gilstrap v. Heights Fin. Corp.*, No. 85-1385, 1986 WL 27587 (C.D. Ill. Aug. 28, 1986), the court stated that "[e]xamples of a bona fide error include, but are not limited to, clerical, calculation, ***computer malfunction and programming***, and printing errors." *Id.* at 2 (emphasis added).

37. The programming error in this case is precisely the sort of *bona fide* error for which the statute creates a defense. [4]

38. At all times relevant to this proceeding, Access maintained policies and procedures designed to ensure that merchant-owned ATMs disclosed proper fee notices both by sticker and by electronic readout.

39. Gooding's acknowledges that its employee attended an Access training course and, in fact, received training regarding transaction surcharge fee disclosures.

40. Notwithstanding that Access maintained and followed these procedures, the Gooding's employee failed to program the ATM correctly.

41. Because Access does not exercise daily control over the Gooding's ATM, Access had no way to discover or correct this error.

---

[3] Although there is only one reported case discussing bona fide error under the EFTA, that provision is substantially similar to the unintentional or bona fide error provision of TILA. *See* 15 U.S.C. § 1640(c).

[4] *See also Henning v. Daniels*, 653 F.2d 104 (4th Cir. 1981) (finding unintentional error under TILA where defendants uncontroverted testimony was that omission was oversight); *Bailey v. Defenbaugh & Co. of Cleveland, Inc.*, 513 F. Supp. 232 (N.D. Miss. 1981) (finding unintentional error under TILA where defendant did not deliberately omit signature).

## CONCLUSION

Access is not liable to Polo under the EFTA because Polo did not individually rely on the erroneous ATM transaction surcharge fee notice. Moreover, Access is entitled to a defense verdict because Access was not a statutory operator responsible for accurately disclosing the ATM fee. And finally, Access is not liable because the erroneous ATM transaction surcharge fee notice that Polo received was unintentional, and Access had implemented procedures to ensure that such notices were accurate. Judgment should be entered on behalf of Access.

Respectfully submitted,

s/ Brian K. Frazier

Robert M. Brochin
Florida Bar No. 0319661
MORGAN, LEWIS & BOCKIUS LLP
McLean, Virginia 22102
5300 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2339
Telephone:   305.415.3456
Facsimile:   305.415.3001

Douglas P. Lobel (*pro hac vice*)
David A. Vogel (*pro hac vice*)
Brian K. Frazier (*pro hac vice*)
ARNOLD & PORTER LLP
1600 Tysons Boulevard
Suite 900
McLean, Virginia 22102
Telephone:   703.720.7000
Facsimile:   703.720.7399

Counsel for Defendant E*TRADE Access, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2004, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system.  I further certify that a copy of the foregoing

was furnished to the following persons by US Mail on this 20th day of September 2004:

*Counsel for Plaintiff Gilbert Polo:*

Brian G. Pincket
(Florida Bar No. 501425)
MILAM & HOWARD, P.A.
50 N. Laura Street, Suite 2900
Jacksonville, Florida 32202
Telephone:     (904) 357-3660
Facsimile:     (904) 357-3661

Stacy Bardo
Lance Raphael
THE CONSUMER ADVOCACY CENTER, P.C.
180 West Washington, Suite 700
Chicago, IL 60602
Telephone:     (312) 782-5808
Facsimile:     (312) 377-9930

*Counsel for Defendant Gooding's Supermarkets:*

T. Todd Pittenger
(Florida Bar No. 0768936)
LOWNDES, DROSDICK, DOSTER,
 KANTOR & REED, P.A.
215 North Eola Drive
Orlando, Florida 32802-2809
Telephone:     (407) 843-4600
Facsimile:     (407) 423-4495

s/ Brian K. Frazier
Brian K. Frazier

730701_2.DOC